JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Chief
CLIFFORD E. STEVENS, JR., Trial Attorney (D.C. Bar #463906)
MARY HOLLINGSWORTH, Trial Attorney (AZ Bar # 027080)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 353-7548
Facsimile:  (202) 305-0275


Attorneys for Federal Defendants


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| Center for Biological Diversity, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 4:14-cv-02506-RM |
| v. | ) ) ) | **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY** |
| Sally Jewell, et al., | ) ) | **JUDGMENT AND RESPONSE TO** |
| Defendants, | ) ) | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| and | ) ) | |
| National Association of Home Builders, et al., | ) ) ) | |
| Intervenors/Defendants. | ) ) | |

# TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

   I.   The Endangered Species Act ....................................................................................... 2

   II.  Factual Background ...................................................................................................... 3

ARGUMENT ....................................................................................................................... 9

   I.   CBD has failed to meet its burden of showing that there is no set of circumstances under which the Policy would be valid .................................................................................. 10

   II.  Under *Chevron*, the Policy sets forth a reasonable interpretation of the SPR phrase and is entitled to deference ...................................................................................................... 12

   III. The draft and final policies do not reflect a change in position on the meaning of the SPR phrase .......................................................................................................................... 18

   IV. Congress does not require FWS to list a species based on the fact that a population in the United States may eventually be extirpated ....................................................................... 21

   V.  The draft policy's SPR interpretation as applied in the Finding is permissible and reflects FWS's considered view of the ambiguous statutory language ......................................... 26

      A.  The interpretation of "significant" in the draft policy as applied in the Finding should receive *Chevron* deference ........................................................................................... 26

      B.  "Significant" is an ambiguous term that was reasonably defined and applied in the Finding ........................................................................................................................ 30

CONCLUSION ................................................................................................................... 35

**INTRODUCTION**

Plaintiffs Center for Biological Diversity, et al. ("CBD"), challenge two agency actions in this case. First, CBD challenges the October 5, 2011 decision of the U.S. Fish and Wildlife Service ("FWS") that the cactus ferruginous pygmy owl ("pygmy owl") does not warrant listing under the Endangered Species Act ("ESA"). 76 Fed. Reg. 61,856 (Oct. 5, 2011) ("Finding"). Second, CBD brings a facial challenge to the 2014 joint final policy of FWS and the U.S. National Marine Fisheries Service ("NMFS") (collectively, "the Services") interpreting the ESA statutory phrase "significant portion of its range." 79 Fed. Reg. 37,578 (July 1, 2014) ("Final Policy").

CBD's challenge raises only a narrow, entirely legal question. Under the ESA, a species may be listed when threatened or endangered throughout all or a "significant portion of its range." 16 U.S.C. § 1532(6), (20). The question raised is whether the Services have adopted an impermissible interpretation of this ambiguous statutory phrase. The answer to this question is simply no. Contrary to CBD's claims, the Services' interpretation does not render that phrase superfluous. It gives independent meaning to the phrase by creating additional situations where the rangewide listing of a species is appropriate based on threats in a portion of its range. At the same time, the Services' interpretation avoids setting the bar for what is a "significant" portion of the range so low that species are listed throughout the range based entirely on a portion of the range that is not biologically important enough to the continued viability of the species. The Services found that setting the bar too low would improperly extend the very substantial ESA protections to species that do not need them, resulting in unnecessary regulatory restrictions and reduced conservation resources for other species with a greater need.

CBD has failed to meet its burden of showing that the Services' interpretation is unreasonable. Focusing entirely on the pygmy owl, CBD fails to show that the Services' interpretation could never be validly applied in any factual circumstance. CBD simply

1

dislikes where the Services have drawn a line that Congress left them to draw. It asks this Court to declare that the ESA requires the Service to determine the significance of a portion of a species' range based on factors other than biological significance, such as the location of a portion of its range in the United States. But altering the agencies' reasonable judgments on these questions is a matter for Congress, not this Court. Under the deferential standard of review applicable to agency interpretations of ambiguous statutory language, the Services' reasonable interpretation of "significant portion of its range" must be upheld, both as applied in the Finding and as stated in the Final SPR Policy.

## BACKGROUND

## I.  The Endangered Species Act

Congress has directed the Secretary to determine whether a species should be listed as endangered or threatened. 16 U.S.C. § 1533.[1] Under the statute, the term "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment ("DPS") of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). A species is deemed "endangered" if it is "in danger of extinction throughout all or a significant portion of its range," while a "threatened species" is one "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* at 1532(6), (20). Congress did not define in the statute the phrase "significant portion of its range," or the terms "significant" or "range." Nor did Congress impose any geographical boundaries to a species' status assessment; rather, Congress required the Secretary to consider the species' status "throughout all or a significant portion of its range," whether the range is wholly within the United States or crosses international boundaries.

---

[1] The ESA is administered jointly by FWS and NMFS. The pygmy owl falls under the jurisdiction of FWS. *Id.* § 1532(15); 50 C.F.R. § 402.01(b).

2

When FWS receives a petition to list a species, it must, "[t]o the maximum extent practicable," make a finding within 90 days of the receipt of the petition, determining whether the petition presents substantial information indicating that the petitioned action may be warranted. 16 U.S.C. § 1533(b)(3)(A). By regulation the agency must issue a positive 90-day finding if the petition contains "[the] amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. §424.14(b)(1).[2] If, as in this case, FWS makes a "positive" 90-day finding, then, within 12 months after receiving the petition, it must make a finding that the petition is warranted, not warranted, or warranted but precluded by other higher listing priorities. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3). Under ESA Section 4, the Secretary must evaluate whether a species is endangered or threatened because of one or more of five listing factors. 16 U.S.C.. § 1533(a)(1)(A)-(E). The determination whether to list a species must be made "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

## II. Factual Background

The pygmy owl is somewhat of a habitat generalist found in the United States and Mexico. *See* 71 Fed. Reg. 19,452, 19,452 (Apr. 14, 2006). Most pygmy owls are found in Mexico, where they are considered "one of the most common birds" in the southern portion of the range and probably number in the thousands. PO2241. In the United States, there is a very small population of around 50 owls in the Sonoran Desert in Arizona. PO2240. When considered with the population just south of the border, the owl likely numbers in the hundreds in the Sonoran Desert. Defendants' Statement of Facts ("DSOF")

---

[2] CBD quotes statements from the 90-day finding. MSJ at 5. These conclusions should be considered in light of the relatively low bar described above for reviewing information presented in a listing petition at this stage of the ESA listing process.

3

24. Although not mentioned anywhere in CBD's brief, there is also a larger population of pygmy owls in southern Texas believed to number around 1800. PO2241.

CBD, among others, submitted its first petition to list the pygmy owl as an endangered or threatened species in 1992. In 1997, FWS published a rule in which it determined that the Arizona population constituted a DPS that was endangered. DSOF 12. In that rule, FWS also determined that "new information indicate[d] that listing the species as threatened in Texas [was] not warranted." 62 Fed. Reg. 10,730 (Mar. 10, 1997). CBD did not challenge that finding. The 1997 listing rule was successfully challenged by the National Association of Home Builders ("NAHB"), among others. DSOF 13. In 2003, the Ninth Circuit issued a decision in which it determined that the Arizona population did not qualify as a DPS. *NAHB v. Norton*, 340 F.3d 835 (9th Cir. 2003); *see also* DSOF 13. The court noted that, under the Services' DPS Policy, a population must be significant "to the species to which it belongs." *Id.* at 839, 842. The Ninth Circuit agreed that the Arizona population was discrete because "[i]t is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist." *Id.* at 842-44. However, the court concluded that FWS failed to establish a rational basis for its finding that the Arizona population was biologically or ecologically "significant to its taxon" as the term is defined in the DPS Policy. *Id.* at 844.[3] In light of the Ninth Circuit's decision, FWS reassessed its determination and concluded that the Arizona population did not qualify as a DPS because the Arizona population is not significant to the taxon as a whole. *See* DSOF 14.

---

[3] Under the DPS Policy, significance is evaluated by considering such factors as: (1) persistence of the DPS in an ecological setting unusual or unique for the taxon; (2) evidence that loss of the DPS would result in a significant gap in the range of the taxon; (3) evidence that the DPS represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; or (4) evidence that the DPS differs markedly from other populations of the species in its genetic characteristics. *Id.* at 844.

4

Accordingly, FWS issued a rule removing the pygmy owl from the list of endangered and threatened wildlife. DSOF 14. CBD did not challenge the 2006 delisting rule.

In 2007, CBD submitted a second petition to list the pygmy owl and requested that FWS consider the Arizona population together with the majority of the Sonora, Mexico population, which FWS described in the Finding as the Sonoran Desert Ecoregion ("SDE"). PO2233; 2268; *see also* DSOF 15. In 2008, FWS issued a positive 90-day finding and initiated a status review to determine whether listing the owl was warranted. PO2233. As with any agency determination, the Finding went through multiple drafts, including a preliminary 2009 draft highlighted by CBD. DSOF 17. As confirmed in the Finding, there is no dispute that the best available science shows that the owls in the SDE are experiencing threats. *See* DSOF 18; PO395. However, FWS's SPR assessment evolved based on a sequence of events: first, two 2010 court decisions rejected challenged aspects of a 2007 Memorandum Opinion ("SPR M-Opinion") issued by the Solicitor of the Department of the Interior analyzing the SPR language[4]; next, the Solicitor withdrew that opinion; and, finally, the Services developed a draft joint policy interpreting the SPR phrase. The draft policy was in near final form when FWS completed the pygmy owl Finding. Thus, CBD's contention that FWS "abruptly reversed course" between the 2009 draft and the 2011 Finding is meritless. *Compare* MSJ at 9 *with* DSOF 19.

FWS initially considered in its SPR assessments for the owl the M-Opinion and the draft guidance that the agency had prepared based on that M-Opinion.[5] In the M-Opinion, the Solicitor acknowledged that FWS had "broad discretion" to define the SPR phrase and the term "significant" in particular. SPR429; *see also* SPR435-36. The M-Opinion set forth a number of factors that FWS could consider in its SPR assessments, but did not

---

[4] The M-Opinion was never considered by NMFS in its SPR assessments.
[5] Although this draft guidance, which CBD claims was "agency-wide listing policy," MSJ at 6, was applied for a short period of time, it was never subject to notice and comment nor was it ever finalized, DSOF 9.

5

recommend a specific definition. DSOF 6. The Solicitor also agreed with the Ninth Circuit that the SPR phrase must be given substantive effect, but interpreted the statute to allow FWS to list only the portion of the range that it concluded was significant and met the criteria for listing. In other words, the Solicitor took the position that a finding that a portion of the range was endangered or threatened did not require rangewide listing, but rather required only that the portion of the range be listed. The application of this aspect of the M-Opinion was challenged by CBD and others and several courts issued decisions in 2010 concluding that this challenged aspect of the opinion was inconsistent with the plain language of the statute.[6] DSOF 8. Although CBD correctly notes that those decisions are not directly "at issue here," MSJ at 6 n.2, the decisions provide the context for the Services' development of an appropriate significance threshold reflected in the draft and final policies and the application of that threshold to the Finding.

As a result of the 2010 court decisions, the Solicitor officially withdrew the M-Opinion, *see* DSOF 9, and FWS started considering the approach to assessing significance set forth in the soon-to-be published draft policy *see* MSJ at 9

---

[6] CBD makes much ado of the fact that the Services did not adopt certain proposed significance factors in the M-Opinion that were not challenged by environmental organizations. CBD implies that, if the courts did not address those unchallenged aspects of the M-Opinion, that is a sign that those aspects represent a permissible reading, if not the only permissible reading, of the statutory language. *See* MSJ at 17. It is unsurprising that the courts limited their decisions to the aspect of the M-Opinion actually challenged by plaintiffs—whether FWS may use the SPR language to list less than all members of a species. *See* SPR4. Even if the courts asserted that the proposed significance factors were reasonable considerations, FWS still maintains the discretion to adopt a different, reasonable interpretation of the SPR language. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Moreover, the question of whether the M-Opinion otherwise set forth a reasonable interpretation of the SPR phrase is irrelevant. The Policy must be upheld "if it is a reasonable interpretation of the statute – not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009).

(acknowledging that FWS followed the approach set out in the draft policy).[7] In the earlier 2009 draft cited by CBD, the significance threshold was described as a contribution "at a level such that [the loss of individuals in that portion] would result in a decrease in the ability to conserve the species." PO635. Under the draft policy, FWS "would conduct a theoretical evaluation of the species' status without the portion at issue to determine if the species would be endangered range-wide without that portion." PO784. FWS determined it was appropriate to re-evaluate the significance of the SDE portion in a way consistent with the Services' draft policy.  DSOF 19-21.

In the Finding, FWS first assessed rangewide threats to the species, PO2260-61. As the Finding explains, the "mere identification of factors that could impact a species negatively is not sufficient to compel a finding that listing is appropriate; [FWS] require[s] evidence that these factors are operative threats that act on the species to the point that the species meets the definition of threatened or endangered under the Act." PO2261 (emphasis added). FWS found that, although some impacts seemed significant individually, "the severe impacts were restricted to an area that constitutes a relatively small portion of the pygmy-owl's range." PO2243. Based on the best available science, FWS determined that, for the majority of the owl's range (the 73% of the range south of the SDE), "many impacts to pygmy-owl habitat are reduced in their magnitude and severity or absent altogether." PO2255; PO2262 ("Negative factors affecting pygmy-owls seem to be restricted, for the most part, to a relatively small portion of its range."). FWS also found that the SDE population has already "adapted to the hotter, more arid conditions that may prevail in the future," and that "[t]his adaptation may be important to the continued existence of the subspecies as desertification spreads in response to climate

---

[7] CBD appears to complain that FWS applied the draft policy "although the draft policy had yet to be subjected to public notice and comment." MSJ at 9; 17; 24. However, the M-Opinion was never subjected to notice and comment. *See* DSOF 5.

change, <u>but may be offset</u> as some future model scenarios predict a reduction in columnar cacti densities, the primary pygmy-owl nesting substrate within the" SDE region. PO2259 (emphasis added). FWS concluded that "threats throughout the majority of the pygmy-owl's range are not of sufficient imminence, severity, or magnitude to indicate that the pygmy-owl is in danger of extinction (endangered), or likely to become endangered within the foreseeable future (threatened), throughout all of its range." PO2262.

FWS then assessed whether any population qualified as a DPS. CBD had requested in its petition that FWS consider a Sonoran Desert DPS and an Arizona DPS. PO2262. To be considered a DPS, a population segment must be both discrete and significant as those terms are defined in the Services' DPS Policy. PO2262. FWS determined that there is no evidence that the Sonoran Desert population is "markedly separated in any way from the remainder of the taxon" and, thus, does not meet the discreteness requirement. PO2263. FWS also found that the petitioned Arizona DPS was "exactly the same DPS configuration that was the subject of litigation" and determined by FWS following remand by the Ninth Circuit not to qualify as a DPS and, thus, did not now qualify as a DPS for the same reasons. *Id*. CBD does not challenge those findings.

FWS went beyond CBD's petition request and determined that there are Western and Eastern DPSs. PO2264. As relevant here, the Western DPS consists of the owls occurring from lowland central Arizona south through western Mexico to the States of Colima and Michoacán, and the Western DPS range comprises about 68% of the entire range of the taxon. PO2264-65. FWS assessed the status of the Western DPS and found the following:

> Despite the potential effects of [the various] impacts within the western portion of the pygmy-owl's range, low population numbers, and apparent declines in local pygmy-owl populations in the northern portion of this population segment, the best available scientific and commercial data indicate that pygmy-owls remain common in the majority of the western portion of the pygmy-owl's range.

PO2265. The Finding also noted that "[r]ecent survey and monitoring in Sonora indicated that the highest densities of pygmy-owls occurred in the Sinaloan deciduous forest of

southern Sonora," which is part of the western portion of the range. PO2265. Accordingly, FWS determined that listing the Western DPS is not warranted. PO2265.

FWS then undertook an SPR analysis and determined that there was a geographic concentration of threats in the SDE and, thus, that portion of the range warranted further consideration. PO2267-68; *see also* DSOF 23-25. However, FWS determined that the SDE population was neither significant to the rest of the range nor to the rest of the Western DPS and so did not qualify as a significant portion of the species' range, as discussed in more detail below.

## ARGUMENT

CBD's challenge to the Finding is quite narrow and can be distilled down to three points. CBD argues that the threshold for significance in the draft and final policies is so high that the SPR language is superfluous, that FWS's interpretation of "significant" in those policies must be unreasonable because it did not result in the listing of the SDE population, and that it is unreasonable because the policies do not explicitly factor in the potential loss of a U.S. population in the significance assessment. Most of CBD's arguments rely on a misunderstanding of the threshold set out in the Policy and CBD's incorrect assumptions that the Solicitor's M-Opinion was binding FWS policy and that the draft and final policies represent a change in position from the M-Opinion.

CBD does not challenge FWS's determination that the pygmy owl is <u>not</u> endangered or threatened throughout its range or throughout the Western DPS. CBD does not challenge FWS's determination that, if the SDE population were extirpated, neither the rest of the range nor the rest of the Western DPS would be endangered. Nor does CBD affirmatively argue that either the rest of the range or the Western DPS would be threatened without this population, a finding that would alter the listing determination

under the Final Policy.[8] Instead, CBD puts all of its eggs in one basket, arguing that FWS's interpretation of the SPR language in the draft and final policies was unlawful because, according to CBD, the policies "deprive[] the [SPR] phrase of any independent meaning." MSJ at 17.  It is possible that CBD limited its arguments in this way because it either does not believe the evidence shows that the few hundred pygmy owls in the SDE are so significant that, in its absence, the rest of the range or DPS would be threatened or endangered or, by making that argument, CBD would have to admit that, in fact, a species may be listed under the ESA based on FWS's reasonable interpretation of the SPR phrase. In any event, CBD's arguments must be rejected for the reasons stated below.

## I. CBD has failed to meet its burden of showing that there is no set of circumstances under which the Policy would be valid

CBD argues that, under the interpretation of "significant" in the draft and final policies, the SPR phrase is effectively read out of the ESA. MSJ at 2. The Services' issued their first and only policy interpreting the SPR phrase almost three years after FWS published the Finding and, thus, CBD's challenge to the Final Policy can be considered only as a facial challenge. To succeed on a facial challenge, CBD bears the burden of showing that "no set of circumstances exists" under which this legally binding Policy would be valid. *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)); *see also Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008) (applying the "no set of circumstances" test to a challenge to a city

---

[8] Under the Final Policy, FWS now considers whether the rest of the range would be endangered <u>or</u> threatened if the portion of the range at issue were extirpated. In contrast, under the draft policy, a portion was significant if its "contribution to the viability of the species was so important that, without that portion, the species would be endangered. SPR75-76. Thus, FWS only directly assessed whether the rest of the range would be endangered if the population at issue were extirpated. Because CBD has waived any argument regarding whether the remaining range would be threatened if the SDE portion were extirpated, we do not address that issue in this brief.

10

personnel policy requiring pre-employment drug and alcohol screening as a condition to a job offer). The Ninth Circuit has described this as a "high bar" to overcome. *Id.*

To meet its burden, CBD appears to argue that the Policy cannot be valid because the Services did not identify in the Policy species that could be listed under the ESA based solely on their status in an SPR. *See* MSJ at 18, n.9; 19. CBD provides no support for its assertion that such a requirement exists. Moreover, it would be improper for the Services to make such statements without first reviewing the status of a species based on the best available science and allowing the public an opportunity to comment on a proposed rule, as required by the ESA and Administrative Procedure Act ("APA").

Additionally, CBD is fully aware that NMFS recently found that listing a species was warranted based on threats to a significant portion of the species' range. *See* ECF 44 at 4. Consistent with the proposed rule, in the final rule on the petition to list the African coelacanth, NMFS found that the "threats to the species across its range are generally low, with isolated threats of overutilization and habitat loss concentrated in the Tanzanian portion of the range." 81 Fed. Reg. 17,398, 17,400 (Mar. 29, 2016). As to the significance of this portion, NMFS explained that there are three known, isolated populations of the fish. *Id.* at 17,401. Two of the populations face a low level of threats, but the third—the Tanzanian portion—is subject to increased catch rates and faces threats from a planned deep-water port to be located in its habitat. *Id.* NMFS found that, should the Tanzanian portion be extirpated and only two populations remain, then the species would be faced with an increased extinction risk due to a catastrophic event, such as a storm, disease or temperature anomalies. NMFS thus concluded the portion was a significant portion, demonstrating irrefutably that the phrase has independent meaning. *Id.* To our knowledge,

1   neither CBD nor Defenders submitted any comments that the Final Policy was improperly

2   applied in that case. *See* 80 Fed. Reg. 11,363 (Mar. 3, 2015).[9]

3       Moreover, it is not hard to imagine other scenarios in which a species could be listed

4   under this Policy. If one portion of a species' range is completely extirpated, as a matter

5   of logic, it will be easier to find that the rest of the range is endangered or threatened. *See*

6   *also* SPR8 (discussion of possible circumstances under which a population could be

7   considered significant); DSOF 31. The Services may not reach the conclusion that

8   portions of the range are significant and warrant listing as often as CBD would wish, but

9   there's no doubt that the Services can reach a warranted finding that they would not reach

10  based on a rangewide status assessment. CBD cannot establish that it is impossible to

11  come to a warranted finding based on an assessment of threats to a significant portion of

12  the range without also finding that the species is endangered or threatened rangewide.

13  **II. Under *Chevron*, the Policy sets forth a reasonable interpretation of the SPR**
    **phrase and is entitled to deference**

14      There is no merit in CBD's assertion that the Final Policy's interpretation "renders the

15  SPR language superfluous" and "contravenes Ninth Circuit precedent," which requires

16  that the agencies give effect to the SPR phrase. MSJ at 30.[10] Although the threshold

17  established in the Policy for significance is not as low as CBD would prefer, the

18  interpretation is reasonable and provides an independent basis for listing, as described

19  above. Thus, CBD's argument should be rejected.

20

21

22  _____

23  [9] Under the Final Policy, if a vertebrate species is endangered or threatened in an SPR,

24  "and the population in that significant portion is a valid DPS, [the agencies] will list the
    DPS rather than the entire taxonomic species or subspecies." SPR106. NMFS determined

25  that the SPR constituted a valid DPS and, thus, issued a final rule listing the Tanzanian

26  DPS of African Coelacanth as a threatened species. 81 Fed. Reg. 17,398. CBD does not
    challenge this aspect of the SPR Policy.

27  [10] There is no dispute that the SPR language must provide an independent basis for listing

28  a species. *See* Final Policy, SPR77; *see also* 2011 Finding, PO2266; MSJ at 14-15. Thus,
    we do not address that issue here.

When Congress authorizes an agency to issue rules or regulations interpreting a statute, the interpretation receives deference if the statute is ambiguous and the agency's interpretation is reasonable. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016). Neither "significant portion of its range" nor "significant" is defined in the ESA. The Ninth Circuit has described the SPR phrase as "puzzling," "enigmatic," and "inherently ambiguous." *Defenders of Wildlife v. Norton* ("*DOW*"), 258 F.3d 1136, 1141 (9th Cir. 2001); *see also* SPR76 (the Services explaining that this provision "create[s] a variety of tensions and ambiguities" and, thus, "there is no single best interpretation"). Because the SPR phrase is ambiguous, the Court's analysis begins with *Chevron* step two, because Congress clearly delegated authority to the Services to make rules carrying the force of law, and the agency interpretation was promulgated in the exercise of that authority. *See N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 772-73 (9th Cir. 2010). Thus, as this Court has already determined in another case, the "Policy, which was subject to notice and comment and officially sets forth [FWS's] interpretation of what it means for a species to be in danger of extinction 'throughout all or a significant portion of its range,' is entitled to *Chevron* deference and is reviewed only for reasonableness." *WildEarth Guardians* ("*WEG*") *v. Jewell*, 134 F. Supp. 3d 1182, 1192 (D. Ariz. 2015).

In reviewing an agency's interpretation of an ambiguous statutory term, "*Chevron* requires a federal court to accept the agency's [reasonable] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Brand X*, 545 U.S. at 980. As CBD must concede, the Ninth Circuit has made clear that FWS has a "wide degree of discretion in delineating 'a significant portion of its range.'" *DOW*, 258 F.3d at 1145; *see also Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 876-77 (9th Cir. 2009) (noting that the Ninth Circuit in *DOW* acknowledged that FWS had a "wide degree of discretion" because the SPR phrase was undefined and, thus, the court had "left the appropriate criteria for testing 'significance' undefined").

Under the Final Policy, a

portion of [a] range of a species is 'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range.

SPR76. As explained in the Policy, the agencies chose this definition because it is "biologically based," "conforms to the purposes of the Act, is consistent with judicial interpretations, and best ensures species' conservation." SPR78. This interpretation considers the biological importance of the portion of the range at issue by assessing the increase in the risk of extinction for the species in the absence of the members in that portion. SPR78. This assessment is based on the "principles of conservation biology using the concepts of redundancy, resilience, and representation."

Grasping at straws, CBD argues that the interpretation must be unreasonable because CBD and Defenders of Wildlife submitted comments that stated that, in their belief, the interpretation was unreasonable because it fails to give the SPR language independent meaning. MSJ at 19. They also appear to argue that the interpretation is unreasonable because the agencies received 42,000 comments on the draft policy. *See* MSJ at 19; 32-33. However, CBD fails to mention that around 41,500 of these comments were form letters submitted through CBD. DSOF 29. In any event, CBD's opinion that the interpretation is unreasonable does not establish that it is in fact unreasonable. Moreover, CBD's views are belied by the fact that the Policy already has been applied to come to a warranted finding and, as a logical matter, it will be easier to come to a warranted finding based on this interpretation, as discussed above. CBD also argues that the interpretation is unreasonable because the agencies did not list examples of species that would be listed based on an SPR assessment. MSJ at 21; 32-33. For the reasons already stated, this argument is not persuasive and should be rejected.

14

CBD also misconstrues the threshold for significance in the Policy as being the same threshold that the Ninth Circuit rejected in *DOW*. The Ninth Circuit rejected the following proposed definition: "the portion of the range must be so important that <u>current imperilment</u> there would mean that the species would be currently imperiled everywhere." *See* 79 Fed. Reg. 37,578, 37,581 (July 1, 2014) (emphasis added). In contrast, the threshold for significance in the Finding is whether, if the species were hypothetically to be <u>completely extirpated</u> from that portion of its range, the species in the remaining portions of the range would be in danger of extinction. PO2267. Thus, unlike the rejected interpretation, the Services do not ask whether the species is already endangered or threatened because of what may be happening in the SPR; such an interpretation would, as plaintiffs and the Ninth Circuit noted, collapse the inquiry with regard to the portion and the inquiry range-wide.  Instead, the Policy's interpretation allows for listing in situations where the range-wide evaluation would not, giving independent effect to the SPR language. Contrary to CBD's assertions, MSJ at 13, the Policy explains the basis for establishing this threshold and how it would be applied. SPR78-79; *see also WEG*, 134 F. Supp. at 1195 (noting that "the 2014 Policy explain[s] why the Service believes there is a difference between the definition rejected by the court in [*DOW*] and the one now used by the Service and why it believes the new definition gives the term independent meaning").

CBD also appears to improperly conflate two steps in the SPR analysis. As part of the SPR analysis, FWS must consider whether any identified portion of the range is significant and it must also assess the status of that portion on its own. SPR77. For an SPR analysis to lead to a listing, the portion must be both significant to the overall species and itself currently endangered or threatened. CBD states that "if a portion of a species' range is so vital that its loss would render the entire species 'either endangered or threatened,' and the portion *itself* is endangered or threatened (which would be a prerequisite to a listing in any case), then the species is *necessarily* endangered [throughout]" its range, rendering

the SPR language surplusage. MSJ at 32. That is incorrect for at least two reasons. First, the status of the portion of the range at issue is not factored into the significance test. Second, CBD ignores the fact that a portion can be imperiled yet still contribute to the viability of the species. If one assumes that portion is no longer there, then the rest of the range does not benefit from those contributions and it would necessarily be easier to conclude that the rest of the range is threatened or maybe even endangered.

CBD also incorrectly claims that the interpretation is unreasonable because the M-Opinion required special consideration of the potential loss of the U.S. portion of a species' range. MSJ at 21. In the M-Opinion, the Solicitor stated that the "Secretary has broad discretion in defining what portion of a range is 'significant,' and may consider factors other than simply the size of the range portion in defining what is 'significant.'" SPR429. Nevertheless, CBD clings to two sentences from this 19-page document to attempt to support its claim that the Solicitor directed the Secretary to consider the "importance of protecting a species' range *in the United States*…[when] assessing significance." MSJ at 16; 21. While the Solicitor did say that the Secretary should consider the purpose of the statute in defining "significant," the Solicitor went on to say that, given the findings and stated purpose of the statute,

> it is appropriate for the Secretary to consider factors other than just the size of the portion in relation to the current range as a whole. He *may* define 'significant' in such a way as to insure conservation of the species protected by the Act. For example, the Secretary *could consider*, among other things, the portion of the range in terms of biological importance of that portion of the range to the species and in terms of the various values listed in the Act that would be impaired or lost if the *species* were to become extinct in either that portion of the current range or in the current range as a whole.

SPR437 (emphasis added). In contrast to this language, the Solicitor stated that the Secretary could not define "significant" "to require that a species is endangered only if the threats faced by a species in a portion of its range are so severe as to threaten the viability of the species as a whole." SPR429. In other words, CBD reads too much into the M-

16

Opinion. The Solicitor neither required nor affirmatively recommended that FWS adopt a definition of significant that separately considers a species' status in the United States. Thus, the Final Policy is not in "sharp contrast" to the M-Opinion. *Contra* MSJ at 21.

CBD is trying to use the Finding to imply that the Policy cannot be reasonable because the application of the concepts embodied in the Policy resulted in a not warranted finding for the handful of owls left in Arizona. *See* MSJ at 20.[11] However, in interpreting the ESA, FWS is obligated to consider its interpretation and approach as it applies across the board, not just in this outcome-oriented fashion pursued by CBD. Moreover, it is clear from the listing requirements established by Congress that the purpose of the ESA is not to prevent every single population from being extirpated. As the Policy explains, the Services wanted to establish a threshold for significance that is "high enough to avoid dilution of conservation efforts and unnecessary restrictions," but not so high as to render the SPR phrase meaningless. SPR78. The Policy goes on to explain:

> it is important not to use a threshold for 'significant' that is too low [such as its loss would result in any increase in the species' extinction risk]. Although we recognize that most portions of a species' range contribute at least incrementally to a species' viability, use of such a low threshold would require us to impose restrictions and expend conservation resources disproportionately to conservation benefit; listing would be rangewide, even if a portion of only minor conservation importance to the species is imperiled. In such a situation, a proportion of limited conservation resources would be diverted away from the conservation of species most vulnerable to extinction and used for species that might arguably better fit a lesser standard.

SPR79. This explanation demonstrates that the threshold selected is reasonable because it gives independent meaning to the SPR phrase while still taking into consideration how to best to use the agencies' limited resources for the greatest conservation benefit.

---

[11] CBD also implies that species such as the bald eagle, grizzly bear, and wolf would not have been listed if FWS had been interpreting the SPR phrase at that time the way in which the agency is interpreting the language in the Final Policy. MSJ at 20. None of the listing rules for those species mention, let alone rely on, the SPR phrase to list those species. *See* Response to SOF ¶29. The species mentioned by CBD were listed based on an earlier definition of "species," which has since been replaced by the DPS language. *Id.*

17

CBD suggests that the Services' analysis is inappropriate and, in exaggerated fashion, asserts that FWS thus "stated that setting a threshold that few, if any, species will be able to satisfy is 'desirable.'" MSJ at 35 n.18. But the agencies must consider the practical implications of their policies, and the Supreme Court has indicated that it is appropriate to do so. In discussing the purpose of the "best scientific and commercial data available" standard under ESA Section 7, which also governs the agency's assessment of whether a species should be listed throughout all or a significant portion of its range under Section 4, the U.S. Supreme Court has made clear that this standard is in place to ensure that the ESA is not "implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997). The Court also noted that, although this standard "serves to advance the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id.* at 176-77. In other words, it is permissible for the agencies to consider the wide-ranging effects of establishing a standard that is too high or too low for an ambiguous statutory term. Based on the 2010 court decisions that determined that a finding that a significant portion of a species' range is endangered or threatened must result in the listing of the species rangewide, the agencies reasonably sought to avoid "dilution of conservation efforts and unnecessary restrictions that may result from listing a species based on its status throughout an SPR." SPR78.

## III. The draft and final policies do not reflect a change in position on the meaning of the SPR phrase

The first and only legally binding policy interpreting the SPR phrase was issued by FWS and NMFS in July 2014. *See* SPR75. As FWS noted in the draft policy, "our interpretation does not conflict with an established past agency practice, as no consistent, long-term agency practice has been established." SPR6. The Finding similarly explained that FWS has "never explicitly addressed [the implications of a determination that listing

18

is warranted in a significant portion of the range or what qualifies a portion as significant]
in [the agency's] implementing regulations." PO2266. FWS also noted that, at the time
of the Finding, "no consistent, long-term agency practice ha[d] been established."
PO2266. Yet CBD claims that the SPR M-Opinion developed by the Solicitor of the
Department of the Interior represents FWS's position on the meaning of the SPR phrase
and that any perceived deviations from that opinion reflect a change in position that must
be addressed by FWS. *See* MSJ at 6 (incorrectly describing the M-Opinion as an "agency-
wide listing policy"); MSJ at 24.[12] In general, Solicitor M-Opinions convey legal
conclusions to assist Department of the Interior agencies in interpreting and
implementing statutes and to provide a legal platform for developing their own policies
or rules when appropriate. They are not legislative rules or official agency policy and do
not go through notice-and-comment rulemaking procedures. DSOF 5. The SPR M-
Opinion made clear that "[FWS] is working to develop a policy on how to apply the SPR
phrase…To facilitate the development of this policy, [FWS] requested [the Solicitor's]
view of the meaning of the SPR phrase." SPR427. In addressing possible factors to
consider when defining "significant," the Solicitor confirmed that, "[w]here there is
ambiguity in a statute, as with the meaning of 'significant', the official charged with
administering the statute, which in this case is *the Secretary*, has broad discretion to
resolve the ambiguity and give meaning to the term." SPR436 (emphasis added).
Although FWS applied some aspects of the M-Opinion to a few listing determinations

---

[12] CBD also points to the *Draft* Guidance Regarding Identifying SPRs Under the ESA,
which CBD claims reflects "agency-wide listing policy then in effect." MSJ at 6. Although
the guidance was applied to a handful of findings, as the name of the document suggests,
this was a "draft" document being circulated for comment by the FWS Regional Directors
and was never finalized. SPR521. The draft document also notes the agency is still in the
process of developing guidance on other aspects of the SPR assessment. SPR521.

that were issued while it was preparing a draft policy, FWS never formally adopted the M-Opinion as its position on the meaning of the SPR phrase.

Moreover, the M-Opinion did not recommend a particular interpretation of "significant." Rather, it set forth an opinion as to the range of discretion the Secretary of the Interior has to make an interpretation. Thus, the draft policy cannot reflect a change in any FWS policy. As already mentioned, the Solicitor also affirmed in the M-Opinion that FWS has broad discretion in interpreting the ambiguous term "significant," and that the M-Opinion was simply outlining a list of factors the Services could consider in making a significance determination, with one caveat that is not relevant here. *See* section II. CBD even appears to acknowledge that the M-Opinion simply stated that it "could" include consideration of this factor in its draft policy definition of "significant," MSJ at 20 (Defenders' comments stating that the agencies "could consider the 'various values listed in the Act'"). Thus, the draft and final policies cannot reflect a change in FWS policy. *Cf. Encino Motorcars*, 136 S. Ct. at 2125-26 (requiring an agency to provide a reasoned explanation for completely reversing course in a final rule from a proposed rule that went through notice and comment and was based on decades of practice and a number of court decisions).

In any case, to the extent there are differences between the significance standard in the draft and final policies and the suggestions set forth in the M-Opinion, FWS in fact did acknowledge those differences, contrary to CBD's assertions. *See* MSJ at 24-25. After discussing in detail the significance threshold and the justification for that threshold, the agencies stated that the "conclusion reached in this draft policy is, as noted above, inconsistent with the M-Opinion, and, consequently, a number of listing determinations made by FWS since the issuance of the M-Opinion." SPR6.[13]

---

[13] CBD claims that, although FWS said that significance determinations would be the same as the brief period in which FWS took into consideration the SPR M-Opinion, that

20

**IV. Congress does not require FWS to list a species based on the fact that a population in the United States may eventually be extirpated**

Despite the absence of any language in ESA Section 4—the provision that sets out the requirements for assessing the status of a species—CBD argues that Congress has required FWS to factor into its SPR analysis the loss of a population of a species, such as the pygmy owl, within the United States that is otherwise doing well in another country (or, in this case, in another area of the United States). *See* MSJ at 28. CBD also argues that, because this requirement supposedly exists, FWS was required to explain why it did not give heightened consideration to the status of the Arizona population. MSJ at 13. In support of its novel theory, CBD relies on the Congressional findings and general policy statements in 16 U.S.C. § 1531, which CBD interprets as indicating to FWS and NMFS that they must avoid the loss of any population of a species in the United States. MSJ at 13. Because no such requirement exists, FWS was not obligated to undertake additional analysis or provide separate consideration of the status of the Arizona population beyond its analysis of the status of the species throughout its range, throughout the Western DPS, as a potential DPS, and as a potential significant portion of its range.[14] *Contra* MSJ at 13. CBD argues that FWS and NMFS failed to explain why "significant" is not being interpreted to allow, or even require, listing for the purpose of preventing the extirpation of any U.S. populations of a species. *See* MSJ at 18 (relying on its characterization of the M-Opinion and Congressional findings). Contrary to CBD's assertions, MSJ at 13; 18,

---

"assertion [is] disproven by the agency's reversal of course on the pygmy owl." MSJ at 18. CBD misunderstands the point that the agencies were making. They were explaining that, as a result of this policy, some species would be listed and protected that previously would not have been listed under the clarification approach. SPR17. "However, this result would occur only under a limited set of circumstances." *Id.* The Services then noted that that would likely be the case whether the analysis is done based on the draft policy or the 2008 guidance based on the M-Opinion. *Id.* In other words, they were explaining that either approach would result in an unknown, likely small, number of species being listed, not that the analyses would always result in the same determinations.

[14] CBD does not argue that FWS failed to consider the status of the Arizona population in these analyses.

21

1    the agencies did in fact explain why they chose not to define significance in terms of the

2    "[v]alues stated in Section 2" of the ESA. *See* SPR14-15 (noting, *inter alia*, that taking a

3    values approach would require application of highly subjective standards and could

4    potentially result in the agencies applying protections and conservation resources when

5    the portion of the range that is endangered or threatened is not biologically important to

6    the conservation of the species).

7         As an initial matter, CBD's brief implies that, without the very small Arizona

8    population, pygmy owls will cease to exist in the United States. *See* MSJ at 1 ("allow[ing]

9    the species to be extinguished in Arizona . . . consign[s] [the owl] to the scrap heap of

10    history"); *see also* ECF 1 at 15 (arguing that FWS should factor in the loss of the Arizona

11    population into its significance determination because FWS should be "avoid[ing]

12    extinctions *in the United States*").[15] CBD's argument ignores the fact that there are an

13    estimated 1800 pygmy owls in Texas. As noted in the background section, although FWS

14    proposed the Texas population for listing, the agency ultimately determined that the

15    population did not warrant listing and CBD did not challenge that finding. Nor does CBD

16    raise any arguments regarding FWS's assessment of the Texas population in this Finding.

17    In other words, it is uncontested that the Texas population does not warrant listing.

18         The next problem with CBD's argument is that the Congressional findings and policy

19    statements in the ESA do not go nearly as far as CBD claims. Congress found the

20    following: (1) that various species in the United States have gone extinct as a

21    consequence of development; (2) other species are endangered or threatened; (3) these

---

[15] Although the Arizona population faces threats, it is not a foregone conclusion that this population will be extirpated. As CBD highlights in the Noah Greenwald declaration, there are a number of conservation efforts in place to protect the Arizona population's habitat. *See* ECF 52-1 ¶¶ 12-13. Plaintiffs also highlight efforts to protect pygmy owl habitat, including the creation of a 2400-acre preserve in Marana, just north of Tucson. ECF 52-3 ¶ 10. Just recently, FWS published notice of a habitat conservation plan and incidental take permit that is meant to help protect ESA-listed species, such as the pygmy owl and ensure compliance with the ESA in areas such as Pima County, Arizona. *See* 81 Fed. Reg. 29907 (May 13, 2016).

species are of value to the Nation; (4) the United States has pledged itself to conserve "to the extent practicable" the various species facing extinction pursuant to various international treaties; and (5) encouraging States and other interested parties to develop and maintain conservation programs will help us meet our international commitments. 16 U.S.C. § 1531(a)(1)-(5). Congress explained that the purpose of the ESA is to provide a means to protect endangered and threatened species and their ecosystems and to take such steps "as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a)." 16 U.S.C. § 1531(b). Contrary to CBD's assertions, nowhere does Congress state that the purpose of the ESA is to protect every single population in the United States from extirpation. In fact, Congress's inclusion of the phrases "to the extent practicable" and "as may be appropriate" support the opposite conclusion as well as the Services' consideration of resource issues, over-regulation, and the direction of conservation efforts where they would make the most impact in its interpretation of ambiguous statutory language.

CBD's arguments also ignore the fact that, although Congress included findings stating the importance of wildlife to the Nation, *see* 16 U.S.C. § 1531(a)(3), Congress chose not to include any provisions requiring FWS to consider the status of a species within U.S. borders in isolation of its status outside those borders. To the contrary, the plain language of ESA Section 4 provides that FWS shall assess the status of a species "throughout *all or a significant portion* of its range." *See id.* § 1532(6), (20) (emphasis added).[16] Similarly, the agency shall consider in its status assessment, *inter alia*, threats

---

[16] CBD also argues that it is inappropriate for FWS to determine that listing is not warranted where the species is numerous elsewhere and faces greatly reduced or non-existent threats in the remaining range. *See* MSJ at 2. But that is precisely the sort of assessment FWS is required to make. The purpose of the ESA is not to ensure that every single population of a species is protected from extirpation, regardless of how small it is in relation to the overall population or the extent that its presence affects the viability of the species. Congress has directed FWS to list only those species that are in fact endangered or threatened throughout all or a significant portion of its range. *See* 16 U.S.C. § 1533.

1  to the species' "habitat or range." *Id.* § 1533(a)(1)(A). Noticeably absent from these

2  provisions is any requirement to provide special or different consideration to species that

3  are not doing well in the United States but that are abundant and face significantly fewer

4  threats in other countries.

5  In contrast, Congress did require consideration of efforts being made by States and

6  foreign nations in Section 4(b), which sets out the basis for Section 4 listing

7  determinations. That provision states that the Secretary shall make determinations "solely

8  on the basis of the best scientific and commercial data available [to her] after conducting

9  a review of the status of the species and after taking into account those efforts, if any,

10  being made by any State or foreign nation, or any political subdivision of a State or

11  foreign nation, to protect such species, whether by predator control, protection of habitat

12  and food supply, or other conservation practices, within any area under its jurisdiction,

13  or on the high seas." 16 U.S.C. § 1533(b)(1)(A). Under Section 4(b), the Secretary must

14  also give consideration to species that have been "identified as in danger of extinction, or

15  likely to become so within the foreseeable future, by any State agency or by any agency

16  of a foreign nation that is responsible for the conservation of fish or wildlife or plants."

17  *Id.* at 1533(b)(1)(B)(ii).

18  It is a well-established principle of statutory construction that, "[w]here Congress

19  includes particular language in one section of a statute but omits it in another section of

20  the same Act, it is generally presumed that Congress acts intentionally and purposely in

21  the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

22  Here, Congress addressed the general status of species in the United States and discussed

23  the importance of these species to the Nation in ESA Section 2, but then omitted any

24  geographic-specific conditions in Section 4 where it describes the requirements for

25  assessing the status of a species. Congress could have limited consideration of the

26  species' status to its range within the United States or required separate consideration

27  where a population in the U.S. may face extirpation. However, despite the fact that

28  Congress has revisited the ESA a number of times since it was enacted, it has chosen <u>not</u>

24

to include such language. Moreover, it is easy to see how Congress could have provided for special consideration of U.S. populations at risk of extirpation in the future: Congress could have included such a requirement in ESA Section 4. *Contra* MSJ at 28. As the Supreme Court stated in response to assertions that a Clean Water Act's use of the phrase "for minimizing adverse environmental impact" demanded the agency's regulation require the best technology for "reducing [environmental impacts] to the smallest amount possible," "[w]hen Congress wished to mandate the greatest feasible reduction in water pollution, it did so in plain language." *Entergy Corp.*, 556 U.S. at 219; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (noting "courts must presume that a legislature says in a statute what it means and means in a statute what it says").

Even if the Court agreed that Congress's findings and policy statements should be considered in a species status assessment, it is not for the Court, or CBD, to say how differences in status between U.S. populations and foreign populations are factored into the analysis. Although Congress does not require FWS to consider the status of a species solely within the United States when conducting a threats assessment, FWS has determined that it is appropriate to consider international boundaries when identifying DPSs in part because the statutory language includes the concept of distinctness whereas the SPR language does not. Under the DPS Policy, the agency must consider whether a population segment is discrete in determining whether it qualifies as a DPS. AR2262. FWS's assessment for discreteness takes into consideration "international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant." *Id.* In response to concerns that taking into consideration international political boundaries to delimit a DPS may be supported by good policy reasons, but not scientific reasons, the agencies acknowledged that the inclusion "may introduce an artificial and non-biological element to the recognition of DPS's," but noted that such considerations may be undertaken as a "matter of policy" and is consistent with treaty obligations. SPR360, 361. Specific to this case, FWS did consider differences in conservation status of owls in the United States

(including Arizona and Texas) and Mexico but determined, consistent with Ninth Circuit case law, that neither the Arizona population nor the Sonoran Desert population constituted a valid DPS. PO2262-63.

Moreover, although the Ninth Circuit has never directly addressed this point, the court touched on it in *NAHB* in discussing the application of the DPS Policy. There, FWS took the position that the Arizona population of pygmy owls was significant in part because the extirpation of this population would deprive the United States of its portion of the western pygmy owl's range. *NAHB,* 340 F.3d at 849. The court rejected that argument because the DPS Policy required FWS to show that the population was significant to the taxon as a whole, not just to the United States. *Id.* The court noted that the "gap caused by the loss of the pygmy-owl's Arizona range cannot be significant to the range of the taxon as a whole simply because that range is in the United States." *Id.* The court did not seem particularly bothered that examining the significance of the Arizona population in relation to the entire range might lead to a finding that the Arizona population was not significant and, thus, did not warrant listing. *Id.* at 849-50.

## V.    The draft policy's SPR interpretation as applied in the Finding is permissible and reflects FWS's considered view of the ambiguous statutory language

CBD argues that the interpretation of the SPR phrase applied in the Finding must be unreasonable because the Finding discussed the potential importance of the SDE population to the rest of the range and DPS and yet concluded that the SDE population is not significant as the ambiguous term is defined in the draft and final policies. *See* MSJ at 23-24. There is no doubt that the Finding's interpretation accords with the considered view of the agencies tasked with administering the ESA, as the challenged aspects are generally consistent with the Final SPR Policy.

### A.    The interpretation of "significant" in the draft policy as applied in the Finding should receive *Chevron* deference

CBD emphasizes throughout its brief that the draft policy's interpretation of the SPR phrase was applied to the Finding and this interpretation is consistent with the Final Policy

as relevant here. *See* MSJ at 21. CBD nevertheless argues that FWS's interpretation of "significant" in the Finding is entitled to no deference because the policy was in draft form at the time of the listing determination and had not yet been subject to notice and comment. MSJ at 24. It also argues that, although the policies allegedly "suffer from the same fundamental legal defect," MSJ at 31, the Final Policy cannot provide *Chevron* deference to the draft policy and Finding because the Final Policy considers whether the rest of the range is endangered or threatened, not just endangered as the draft policy and Finding considered, MSJ at 25. CBD's challenge to the draft policy mirrors its challenge to the Final Policy. In its view, the problems that exist in the draft policy are the same problems that exist in the Final Policy. Thus, for purposes of this case, *Chevron* deference should be extended to the draft policy. At a minimum, deference should be extended to those aspects of the draft and final policies that are the same, such as not separately factoring in the potential loss of a U.S. population. According such deference to FWS's interpretation is consistent with the Supreme Court's recognition that "[w]hen it enacted the ESA, Congress delegated broad … interpretive power to the Secretary." *Babbitt v. Sweet Home Chapter of Cmtys. For a Greater Or.*, 515 U.S. 687, 708 (1995).

This Court has already addressed a similar situation and concluded that an earlier interpretation and application of the ESA's SPR phrase that is consistent with the Final Policy is owed *Chevron* deference. *WEG*, 134 F. Supp. 3d at 1192-93.[17] The aspects of the interpretation of "significant" in the Finding that are challenged by CBD are consistent with the permissible construction of the statute set forth in the Final Policy, which is an

---

[17] CBD incorrectly argues that this Court's reasoning in *WEG* is not applicable here because, in that case, there was no change of position on the issue of "range," and the finding applied the same definition of "range" as was set forth in the Policy. MSJ at 25 n.12. As discussed in section xxx, the M-Opinion was provided by the Solicitor, not FWS, and did not recommend or require a particular definition of "significant." Thus, there is no change of position. Moreover, CBD itself argues that the draft and final policies contain the same flaws and that any changes to the significance standard have no practical effect.

"official agency interpretation of the [ESA]," was subject to notice and comment, and should be given *Chevron* deference. *See Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008). That the draft policy interpretation was not necessarily binding at the time of the listing determination is of little legal import. Courts extend *Chevron* deference to an agency's interpretation of a statute when the interpretation postdates the challenged administrative action, as long as it is not displacing a prior agency interpretation. *See Smiley v. Citibank*, 517 U.S. 735, 744 n.3 (1996) (applying deference to the Comptroller of Currency's interpretation of the National Bank Act, even though it was set forth in a regulation that had been issued after the litigation began); *Barnhart v. Walton*, 535 U.S. 212, 221 (2002). Here, as CBD concedes, the agencies in fact adopted in the Final Policy many aspects of the interpretation set forth in the draft policy, particularly those relevant to this case, and thus that interpretation is entitled to *Chevron* deference.

CBD claims that the Supreme Court recently held that "little or no *Chevron* deference is owed to an agency's [interpretation of a statute] unless the agency interpretation has first been adopted pursuant to a 'relatively formal administrative procedure' such as 'notice-and-comment rulemaking.'" MSJ at 23 (citing *Encino*, 136 S. Ct. at 2125). CBD thus implies that the interpretation applied in the Finding, which was formally adopted a few years later in the Final Policy, is entitled to little or no deference. However, the case cited by CBD is inapposite. There, the Court was addressing a procedural challenge to a final rule that "took the opposite position from the proposed rule." *Encino,* 136 S. Ct. at 2123. The Court noted that when Congress "authorizes an agency to proceed through notice-and-comment rulemaking, that 'relatively formal administrative procedure' is a 'very good indicator' that Congress intended the regulation to carry the force of law." *Id.* at 2125. It explained that such deference may not be warranted where a regulation is "procedurally defective." *Id.* The Supreme Court did not address the deference owed an interpretation that is later formally adopted through notice-and-comment rulemaking.

28

Even if the Final Policy cannot provide the basis for *Chevron* deference because it was not yet final when the Finding was issued, "the fact that the [agency] previously reached its interpretation through means less formal than 'notice and comment' rulemaking … does not automatically deprive the interpretation of the judicial deference otherwise its due." *Barnhart*, 535 U.S. at 221. In *WEG*, this Court stated that, even if the Final Policy could not provide the basis for *Chevron* deference, FWS's "interpretation and application of the ESA's '[SPR] phrase in the 2013 Finding is entitled to *Chevron* deference" based on a consideration of the procedures that preceded the interpretation's adoption and other factors, such as 'the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." 134 F. Supp. 3d at 1193. Here, CBD concedes that the interpretation in the draft policy that was published just two months after the Finding was finalized was applied to this Finding. MSJ at 17-18. As the records show, the Services had been in the process of finalizing a draft policy that would soon go through notice and comment and was intended to represent the agencies' official interpretation of the SPR phrase. Thus the interpretation in the Finding should be accorded *Chevron* deference.

Finally, even if the Court agreed with CBD that the SPR assessment in the Finding is not owed any deference and was unreasonable, the error was harmless because remanding the Finding back to FWS for consideration under the Final Policy would be a waste of time and resources because the Final Policy <u>is</u> owed *Chevron* deference and CBD failed to challenge FWS's determination that the rest of the range would not be endangered absent the SDE population. Under the APA standard of review, such non-prejudicial error is not sufficient to invalidate an agency's decision. *See* 5 U.S.C. § 706 (in reviewing an agency's decision, the Court shall take "due account . . . of the rule of prejudicial error"). Nor does CBD argue that, under the Final Policy, the rest of the range would be threatened absent the SDE population.

29

**B. "Significant" is an ambiguous term that was reasonably defined and applied in the Finding**

Even if FWS's interpretation of the SPR phrase as applied in the Finding does not receive *Chevron* deference, its interpretation of an ambiguous statutory term is permissible and is entitled to some deference. CBD argues that the application of the draft policy in the Finding is arbitrary and capricious because the Finding describes a few circumstances under which the SDE population or its habitat could be "important" to the species and "important" is a synonym of the dictionary definition of "significant." MSJ at 26. Once again, "significant" is not defined in the statute and is an ambiguous term.[18] The Ninth Circuit has stated that FWS "necessarily has a wide degree of discretion in delineating a 'significant portion of its range,' since the term is not defined in the statute." *DOW*, 258 F.3d at 1145; *see also Brand X*, 545 U.S. at 980 (an ambiguous statutory term constitutes a "delegation[] of authority to the agency to fill the statutory gap in reasonable fashion"). Merriam-Webster's dictionary defines "significant" as "large enough to be noticed or have an effect"; "<u>very</u> important"; and "having a special or hidden meaning." http://www.merriam-webster.com/dictionary/significant (last viewed on October 18, 2016) (emphasis added). The M-Opinion, which CBD cites throughout its brief with favor, has this to say about the term "significant":

> It is impossible to determine from the word itself, even when read in the context of the entire statute, which meaning of 'significant' Congress intended. . . . [I]f 'significant' were meant to refer to importance, what factors would need to be considered in deciding that a particular portion of a species's range is <u>'important' enough</u> to trigger the protections of the ESA?

SPR435-36. In other words, the M-Opinion recognized that, even if significant means important, there may be degrees of importance and that FWS has "broad discretion to resolve the ambiguity and give meaning to the term." SPR436.

---

[18] CBD points to no authority that suggests, let alone definitively states, that the term "significant" is unambiguous.

In the Finding, FWS explained that

> There are potentially many ways to determine whether a portion of a species' range is 'significant,' we conclude, for the purposes of this finding, that the significance of the portion of the range should be determined based on its biological contribution to the conservation of the species. For this reason, we describe the threshold for 'significant' in terms of an increase in the risk of extinction for the species.

PO2266; *see also* SPR7. Similar to the Final Policy, the Finding provided that a portion qualifies as significant if a portion's biological contribution is so important that, without that portion, the remainder of the species would be endangered. PO2267. In other words, FWS "would not consider the portion of the range at issue to be 'significant' if there is sufficient resiliency, redundancy, and representation elsewhere in the species' range that the species would not be in danger of extinction" should the portion in question die off. PO2267. FWS explained the purpose behind a higher threshold was to ensure that scarce conservation resources are expended where truly needed:

> [G]iven the consequences of finding a species to be endangered or threatened in an SPR would be listing the species throughout its entire range, it is important to use a threshold for 'significant' that is robust…Because nearly any portion of a species' range can be said to contribute some increment to a species' viability, use of such a low threshold would require us to impose restrictions and expend conservation resources disproportionately to conservation benefit; listing would be rangewide, even if only a portion of the range of minor conservation importance to the species is imperiled.

PO2267; *see also* SPR7 (noting that the "result of using a biological or conservation-importance approach would be to apply protections and resources to those species in greatest need of conservation and thus this approach would meet the purposes of the Act"). FWS further explained that its definition of "significant" struck an appropriate balance between giving the SPR phrase independent meaning and minimizing the degree to which restrictions would be imposed and resources expended unwisely. PO2267.

CBD does not dispute that the Finding's interpretation is biologically-based. Rather, CBD argues that the threshold set out in the Finding and two months later in the draft policy must be unreasonable because (1) the agencies further lowered the significance

31

threshold in the Final Policy based on comments received on the draft policy and (2) the Finding refers to some potential contributions by the SDE as "important." *See* MSJ at 27; 32. As to the first point, the purpose of the notice-and-comment process—of which CBD frequently avails itself—is to improve upon draft determinations and interpretations based on the collective wisdom of experts, other federal agencies, and the general public. That the agencies accepted some of the recommendations received shows that the agencies duly considered the comments received and made slight changes that are not relevant to this litigation. *See* SPR78 (discussing consideration of comments received on draft policy). It does not establish that the proposed interpretation was unreasonable, as CBD implies.

As to the second point, in its discretion, FWS chose not to define "significant" as simply "important." As already discussed, FWS explained the biologically-based standard and the reason for setting the significance threshold at the level that it did. Because this is a permissible interpretation of the term, CBD's arguments should be rejected. Moreover, the threshold was not applied in an arbitrary manner. In considering the significance of the SDE population, FWS noted that the population consists of around 50 adult owls in Arizona and "hundreds" in Sonora, Mexico out of the total of thousands of owls that occur rangewide. PO2268. FWS acknowledged the possible role this portion could play "if the predictions about climate change prove correct." PO2268. FWS noted that "there is much uncertainty associated with the current models of individual species responses to climate change," but that the population is likely to become "a more significant contributor" to the long-term viability of the species. PO2269. FWS also noted the unique genetic and behavioral adaptations of the pygmy owls in the area. *Id*. However, FWS also noted that there is "general consensus in the literature and other reports that pygmy-owls remain common throughout most of the areas of Mexico south of Sonora and Texas." *Id*. In contrast, the SDE population is "small and scattered" and represents a small portion of the overall owl population. *Id*. FWS concluded that the best available science does not indicate

that, under the theoretical removal of the SDE population, the remaining portion of the range would be in danger of extinction. *Id.*; *see also* PO767 ("It would be difficult to find that the threats [to the rest of the range] are of sufficient imminence, intensity, or magnitude to indicate that the" pygmy owl is endangered in the absence of the SDE population). Thus, the SDE is not significant. CBD does not challenge these findings.

FWS also considered whether the SDE is significant to the Western DPS. DSOF 26. FWS noted that, although the SDE only represents one-third of the DPS, it "*may provide* important contributions to population numbers, genetic diversity, and status of the pygmy-owls within this DPS." PO2269 (emphasis added). FWS noted that the loss of this portion "*might* represent a significant loss of important habitat and genetic diversity," possibly affecting the redundancy and representation of the owl in this DPS. PO2269 (emphasis added). FWS also acknowledged that the removal of the SDE "might reduce the viability and potential for long-term survival of the remaining portion of the DPS." PO2270 (noting, for example, that the SDE population is uniquely adapted to the Sonoran Desert and loss of this portion "*might* substantially decrease the genetic diversity of the overall DPS to the point that the pygmy-owl *may* not be able to adapt to what *may* be the predominant vegetation community under the predicted effects of climate change" (emphasis added)). Although admittedly this could be considered a close call, FWS ultimately found that the remaining DPS population is likely

> large enough to withstand environmental catastrophes and random perturbations" because it is sufficiently large and "likely supports a higher proportion of the overall population than the [SDE] because [it] is characterized by thornscrub and tropical deciduous forest communities, which have been documented to support higher numbers and densities of pygmy-owls than Sonoran desertscrub communities.

PO2269. Additionally, because the SDE occurs at the northern end of the DPS, "the theoretical loss of that portion would not result in fragmentation of the DPS in a way that would affect movements and connectivity of the pygmy-owl population." PO2269. FWS also found that, although there's a risk that the rest of the DPS "may lack sufficient

resiliency to meet future environmental changes," the owl is "somewhat of a habitat generalist and, if impacts to habitat occur over an extended period of time, these populations may still be able to adapt to environmental changes in this DPS." PO2270. Finally, FWS reiterated that, although the SDE population "possess[es] some unique behavioral and genetic adaptations, [this] population . . . is small and scattered, and thus represents only a small portion" of the Western DPS population. *Id*. CBD did not challenge any of these scientific findings.

In arguing that the application of the draft policy in the Finding was unreasonable, CBD relies on various qualified statements regarding the possible or potential effects of the loss of the SDE population on the remaining pygmy owl range. For example, CBD cites the SPR analysis in the Finding, which states that the habitat found in the SDE "<u>may</u> become increasingly important." MSJ at 12 (citing PO2268). CBD also relies on statements that this portion "<u>may</u> provide important contributions" to the Western DPS, that the loss of this portion of the range "*might* substantially decrease the genetic diversity of the overall DPS," and the ability of the DPS to adapt to impacts from climate change "*may* be substantially reduced." MSJ at 12 n. 7 (emphasis added).

FWS does not dispute that the loss of this portion of the range could have some effects on the rest of the species. However, FWS reasonably determined that, based on the best available science, these potential effects and the loss of support provided by this small group of owls is not sufficiently important to meet the significance threshold. In an earlier round of pygmy owl litigation, the Ninth Circuit rejected FWS's significance finding in the DPS assessment that was based on evidence showing that there were "potential" or "possible" genetic differences when the standard required a showing that the genetic differences were not only "actual," but also appreciable. *NAHB*, 340 F.3d at 851.[19] Based

---

[19] CBD points to the DPS Policy, in which FWS recognized that the most commonly understood meaning of "significant" is "important." MSJ at 26. However, as discussed in

34

on the Ninth Circuit's assessment of the 1997 listing rule, it would be inappropriate to rely on "potential" effects to list the species. And CBD does not argue that FWS's scientific assessment of the threats is incorrect. In other words, CBD does not argue that the threats are actually more severe than FWS found. Therefore, CBD's argument should be rejected.

As a practical matter, CBD seems to be making the case without actually challenging the Finding that, if the SDE population were extirpated, the rest of the range or Western DPS would be endangered or threatened. For example, CBD highlights statements in the Finding such as the "loss of this portion of the range … would move the subspecies towards extinction,  decrease the ability to conserve the subspecies, and the status of the subspecies is likely to change in the future as the identified threats throughout the range of the pygmy-owl continue." MSJ at 8; *see also* MSJ at 1; MSJ at 12 n.7. At worst, such statements could be used to argue that the significance threshold was not correctly applied, rather than the significance threshold being so high as to prevent any listings based on an SPR assessment. But CBD does not go so far as to challenge FWS's finding, perhaps because then it would have to admit that a species can be listed under the Final Policy.

## CONCLUSION

For the reasons set forth above, the Federal Defendants respectfully request that the Court deny CBD's motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.


Dated:  October 21, 2016


                        Respectfully submitted,

                        JOHN C. CRUDEN
                        Assistant Attorney General
                        SETH M. BARSKY
                        Section Chief

---

footnote 3, the DPS Policy's long-standing definition illustrates the fact that the agency can permissibly define "significant" in terms other than this "common" definition.

MEREDITH L. FLAX
Assistant Section Chief

*/s/ Clifford E. Stevens, Jr.*
CLIFFORD E. STEVENS, JR.
Senior Trial Attorney
MARY HOLLINGSWORTH
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0210
Fax: (202) 305-0275
E-mail: clifford.stevens@usdoj.gov
E-mail: mary.hollingsworth@usdoj.gov

Of Counsel:

PHILIP KLINE
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor, Division of Parks &
Wildlife
805 SW Broadway, Suite 600
Portland, OR  97205

*Attorneys for Defendants*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Eric R. Glitzenstein, eglitzenstien@meyerglitz.com
William Stewart Eubanks, II, beubanks@meyerglitz.com

*Attorneys for Plaintiffs*

Norman D. James, njames@fclaw.com
Rhett A. Billingsley, rbilling@fclaw.com

*Attorneys for Interveners/Defendants*

*/s/ Clifford E. Stevens, Jr.*
Attorney for Federal Defendants

37