1    Eric R. Glitzenstein (D.C. Bar No. 358287) (admitted *pro hac vice*)
     MEYER GLITZENSTEIN & EUBANKS LLP
2    4115 Wisconsin Avenue, N.W., Suite 210
     Washington, DC 20016
3    Telephone: (202) 588-5206
     Facsimile: (202) 588-5049
4    eglitzenstein@meyerglitz.com

5    William S. Eubanks II (D.C. Bar No. 987036 (admitted *pro hac vice*_
     MEYER GLITZENSTEIN & EUBANKS LLP
6    3206 Norwood Court
     Fort Collins, CO 80525
7    Telephone: (970) 703-6060
     Facsimile: (202) 588-5049
8    beubanks@meyerglitz.com

9    Attorneys for Plaintiffs

10

11              IN THE UNITED STATES DISRICT COURT
                  FOR THE DISTRICT OF ARIZONA
12   _____

13   CENTER FOR BIOLOGICAL DIVERSITY,          )
     DEFENDERS OF WILDLIFE,                     )
14                                              )
                          Plaintiffs,           )  No. 4:14-cv-02506-RM
15                                              )
                    v.                          )  **PLAINTIFFS' COMBINED**
16                                              )  **OPPOSITION TO FEDERAL**
                                                )  **DEFENDANTS' AND**
17   Sally JEWELL, Secretary, U.S. Department of the )  **INTERVENORS' MOTIONS**
     Interior, Daniel M. ASHE, Director, U.S. Fish & )  **FOR SUMMARY JUDGMENT**
18   Wildlife Service,                          )  **AND REPLY IN SUPPORT OF**
                                                )  **PLAINTIFFS' MOTION FOR**
19                        Defendants.           )  **SUMMARY JUDGMENT**
20   _____)

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

3

**PAGE**

4

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION ....................................................................................... 1

I.      THE FWS'S PYGMY-OWL FINDING CANNOT BE SUSTAINED
        ON THE RECORD BEFORE THE COURT.  ................................... 2

        A.      THE SPR INTERPRETATION APPLIED TO THE
                PYGMY-OWL IS NOT ENTITLTED TO DEFERENCE.  ................... 3

        B.      PLAINTIFFS HAVE NOT "WAIVED" ANY CHALLENGE
                TO THE PYGMY-OWL FINDING.  ....................................... 6

        C.      THE GOVERNMENT'S CONCESSION THAT THE FWS
                MADE A "CLOSE CALL" AGAINST THE PYGMY-OWL,
                WHILE APPLYING AN SPR STANDARD THAT THE FWS
                ITSELF ULTIMATELY DETERMINED SET TOO HIGH A
                BAR, NECESSITATES A REMAND OF THE PYGMY-OWL
                FINDING.  ................................................................... 9

        D.      THE PYGMY-OWL FINDING VIOLATES THE PLAIN
                MEANING OF THE ESA AND CONTRAVENES CONGRESS'S
                CORE PURPOSE TO CONSERVE IMPERILED SPECIES FOR
                THE BENEFIT OF THE "NATION AND ITS PEOPLE."  ............... 14

II.     THE FINAL POLICY DOES NOT ADOPT A REASONABLE
        INTERPRETATION OF THE SPR LANGUAGE. ......................... 21

        A.      THE PERTINENT LEGAL QUESTION IS WHETHER THE
                FWS HAS ADOPTED A REASONABE INTERPRETATION. ......... 22

        B.      THE DEFINITION OF "SIGNIFICANT" IN THE FINAL
                POLICY SUFFERS FROM THE SAME FATAL LEGAL FLAW
                AS THE APPROACH REJECTED BY THE NINTH CIRCUIT IN
                DEFENDERS. ............................................................... 23

1
2
3

C.    THE FINAL POLICY DID NOT ACKNOWLEDGE, LET
        ALONE EXPLAIN, ITS REJECTION OF THE APPROACH TO
        "SIGNIFICANCE" SET FORTH IN THE M-OPINION AND
        APPLIED BY THE FWS IN LISTING DECISIONS. .........................31

CONCLUSION  ..........................................................................................34

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2

# **TABLE OF AUTHORITIES**

3

**CASES**                                                                                           **PAGE**

4
5

*Barnhart v. Dalton,*
    535 U.S. 212 (2002) ........................................................................................... 5

6
7

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ..................................................................................... 21, 31

8
9

*Collins v. Gee West Seattle LLC,*
    631 F.3d 1001 (9th Cir. 2011) .......................................................................... 29

10
11

*Commodity Futures Trading Comm'n v. White Pine Trust Corp.,*
    574 F.3d 1219 (9th Cir. 2009) .......................................................................... 29

12

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ......................................................................................... 15

13
14

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) .......................................................................... 11

15
16

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
    422 F. Supp. 2d 1115 (N.D. Cal. 2006) ............................................................ 11

17
18

*Defenders of Wildlife v. Babbitt,*
    958 F. Supp. 670 (D.D.C. 1997) ................................................................. 12, 13

19
20

*Defenders of Wildlife v. Norton,*
    258 F.3d 1136 (9th Cir. 2001) ..................................... 1, 2, 17, 21, 22, 23, 24, 26, 28

21
22

*Encino Motorcars LLC v. Navarro,*
    579 U.S. ___, 136 S. Ct. 2117 (2016) ............................................................ 5, 6

23

*Environmental Defense Center, Inc. v. EPA,*
    344 F.3d 832 (9th Cir. 2003) ...................................................................... 18, 23

24
25

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ......................................................................................... 34

26
27

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ......................................................................................... 15

28

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service,*
  378 F.3d 1059 (9th Cir. 2004) .............................................................. 10, 26

*Lanier v. Woodburn,*
  518 F.3d 1147 (9th Cir. 2008) ..................................................................... 22

*Nat. Res. Def. Council v. EPA,*
  526 F.3d 591 (9th Cir. 2008) ...................................................................... 34

*National Association of Home Builders v. Norton,*
  340 F.3d 835 (9th Cir. 2003) .................................................................. 13, 20

*National Association of Homebuilders v. Defenders of Wildlife,*
  551 U.S. 644 (2007)................................................................................ 9, 27

*National Cable & Telecommunications Association v. Brand X Internet
  Service,*
  545 U.S. 967 (2005)............................................................................ 21, 31

*Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.,*
  421 F.3d 872 (9th. Cir. 2005) ...................................................................... 23

*Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service,*
  475 F.3d 1136 (9th Cir. 2007) ...................................................................... 13

*Pac. Nw. Generating Cooperative v. Dep't of Energy,*
  580 F.3d 792 (9th Cir. 2008) ....................................................................... 17

*Puente Arizona v. Arpaio,*
  821 F.3d 1098 (9th Cir. 2016) ..................................................................... 22

*Roberts v. Sea-Land Services, Inc.,*
  132 S. Ct. 1350 (2012).............................................................................. 29

*Rock Creek Alliance v. U.S. Fish and Wildlife Serv.,*
  390 F. Supp. 2d 993 (D. Mont. 2005).......................................................... 11

*Sierra Club v. Bosworth,*
  510 F.3d 1016 (9th Cir. 2007) ..................................................................... 23

*Smiley v. Citibank (South Dakota), N.A.,*
  517 U.S. 735 (1996)................................................................................... 5

*State of Cal. Dep't of Soc. Serv. v. Thompson,*
  321 F.3d 835 (9th Cir. 2003) ....................................................................... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978) ........................................................................................ 2, 11

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ....................................................................................... 29, 31

*Utilities Air Regulatory Group v. EPA*,
    134 S. Ct. 2427 (2014) ......................................................................................... 15

*Walters v. Metro. Educ. Enters., Inc.*,
    519 U.S. 202 (1997) ............................................................................................. 15

*Weinberger v. Salfi*,
    422 U.S. 749 (1975) ............................................................................................. 29

*WildEarth Guardians v. Jewell*,
    134 F. Supp. 2d 3d 1182 (D. Ariz. 2015) .......................................................... 4, 5

**Statutes**

5 U.S.C. § 706(2) ....................................................................................................... 23

16 U.S.C. §§ 1531(a)(1)-(3) ...................................................................................... 20

16 U.S.C. §§ 1531(a)(1)-(3), (5) ............................................................................... 17

16 U.S.C. 1531(a)(3) ..................................................................... 1, 2, 14, 19, 21

16 U.S.C. § 1531(a)(5) ............................................................................................... 21

16 U.S.C. §§ 1532(6), (20) ............................................................................. 1, 2, 18

**Other Authorities**

40 Fed. Reg. 31,735 (July 28, 1975) ........................................................................ 25

43 Fed. Reg. 6,230 (Feb. 14, 1978) .......................................................................... 25

61 Fed. Reg. 4,722 ..................................................................................................... 19

61 Fed. Reg. 4,725 ..................................................................................................... 20

62 Fed. Reg. 15,123 ................................................................................................... 33

62 Fed. Reg. 15,153 ................................................................................................... 32

73 Fed. Reg. 77,264 (Dec. 18, 2008) ................................................................. 32

74 Fed. Reg. 15,123 (April 2, 2009) .................................................................. 32

74 Fed. Reg. 56,757 (Nov. 3, 2009) .............................................................. 32, 33

76 Fed. Reg. 61,856, 61,892 (Oct. 5, 2016) .................................................. 1, 12

76 Fed. Reg. 61,892, 61,893............................................................... 2, 15, 21

76 Fed. Reg. 77,000........................................................................................ 20

79 Fed. Reg. 37,578 (July 1, 2014) .................................. 1, 3, 5, 7, 10, 16, 22, 30

79 Fed. Reg. 37,609 ................................................................................... 5, 34

81 Fed. Reg. 11,375........................................................................................ 27

81 Fed. Reg. 17,398 (Mar. 29, 2016) ......................................................... 26, 27

81 Fed. Reg. 17,401........................................................................................ 27

# INTRODUCTION

Neither the Federal Defendants nor Intervenor-Defendant National Association of Home Builders ("NAHB") disputes that, in its final decision refusing to list the pygmy-owl as endangered or threatened, the Fish and Wildlife Service ("FWS") unequivocally found that the pygmy-owl is at imminent risk of extinction in the Sonoran Desert Ecoregion, which includes Arizona, as a result of myriad threats to the pygmy-owl's existence in this portion of its range.  Nor can they dispute that the FWS expressly found in its decision that the Sonoran Desert Ecoregion "represents an *important portion* of the Western DPS ["Distinct Population Segment] and of the taxon as a whole." 76 Fed. Reg. 61,856, 61,892 (Oct. 5, 2016) (emphasis added).  Nonetheless, defendants insist that the pygmy-owl is not endangered or threatened in a "significant portion of its range" ("SPR") within the meaning of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1532(6), (20), although the ordinary, dictionary definition of "significant" is "important," and despite the fact that Congress enacted the ESA to conserve species such as the pygmy-owl because of their "esthetic, ecological, educational, historical, recreational, and scientific value *to the Nation and its people*," *id*. § 1531(a)(3) (emphasis added).  As discussed below, defendants' defense of the pygmy-owl finding is impossible to reconcile with the plain meaning of the ESA or the Act's overriding purpose.  Indeed, it even diverges from the SPR standard that the FWS adopted in the Final Policy interpreting the SPR phrase, and that the FWS itself claimed was necessary to "[l]ower and simplify the threshold for significant." 79 Fed. Reg. 37,578, 37,579 (July 1, 2014).  Consequently, on the record here, Plaintiffs, at minimum, are entitled to a remand of the pygmy-owl finding for further consideration.

As for the Final Policy, while defendants maintain that the interpretation of "significant" ultimately adopted by the FWS comports with the Ninth Circuit's analysis in *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001) ("*Defenders*"), the interpretation actually violates the same cardinal rules of statutory construction applied by the Court of Appeals.  This is demonstrated by the fact that defendants are

conspicuously unable to point to a single species that the FWS has in fact listed, or that it has even proposed for listing, based solely on its status in an SPR as defined in the Final Policy.  Consequently, defendants are relegated to "imagin[ing]" circumstances where the new SPR definition might be invoked, Federal Defendants' Brief ("Br.") 12, but even these exercises in imagination only serve to highlight that the approach adopted by the FWS is functionally identical to the one rejected in *Defenders* and that it similarly robs the SPR phrase of any practical meaning.  Consequently, for these reasons and others discussed below, the definition of "significance" in the Final Policy cannot be sustained as a reasonable construction of Congress's intent in requiring that a species be listed as endangered and threatened if it is facing serious risks to its existence in "throughout all *or a significant portion of its range*."  16 U.S.C. §§ 1532(6), (20) (emphasis added).

## I.   THE FWS'S PYGMY-OWL FINDING CANNOT BE SUSTAINED ON THE RECORD BEFORE THE COURT.

Plaintiffs' opening brief explained that the FWS determined that  the Sonoran Desert Ecoregion is an "*important* portion of the Western DPS, and of the taxon as a whole" – including because the ability of the owl to "adapt to impacts from climate change may be *substantially reduced*" with the loss of the Sonoran Desert Ecoregion – but that an "important portion" of the pygmy-owl's range is not  a "significant" portion for listing purposes.   76 Fed. Reg. at 61,893 (emphasis added).  In doing so, the FWS violated the plain meaning of the statutory language, accomplished the opposite of the "institutionalized caution" that Congress intended the FWS to apply in implementing the ESA, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978), and ignored the ESA's overriding purpose to protect imperiled species for the benefit of the "Nation and its people."  16 U.S.C. § 1531(a)(3); *see* Plf. Br. 26-30.  Plaintiffs also explained that the pygmy-owl finding cannot be afforded any *Chevron* deference because, not only did the SPR interpretation applied in the pygmy-owl finding deviate without explanation from the interpretation of the same language adopted in the March 2007 Interior Department Solicitor's Memorandum, *see* SPR-427-62 ("M-Opinion"), but it also is substantively

2

different from the interpretation adopted, following public notice and comment, in the Final Policy itself.  *See* Plf. Br. 24-25.  Defendants have no persuasive response to these arguments.

### A.   THE SPR INTERPRETATION APPLIED TO THE PYGMY-OWL IS NOT ENTITLTED TO DEFERENCE.

To begin with, the government argues that the SPR interpretation applied to the pygmy-owl – which was embodied in a *draft* policy that was never subjected to public notice and comment – is nonetheless entitled to *Chevron* deference because "this interpretation is consistent with the Final Policy," Br. 26; *see also* Brief of Intervenor-Defendant ("Int. Br.") at 26-30.  At the very same time, however, the government concedes, as it must, that the interpretation applied to the pygmy-owl finding is *substantively different* from the one adopted in the Final Policy.  Br. 27 (admitting that the "Final Policy considers whether the rest of the range is endangered *or threatened* [without the portion at issue], *not just endangered as the draft policy and Finding considered*") (emphasis added).  Moreover, contrary to the post hoc characterization by government counsel that the SPR "interpretation applied in the [pygmy-owl] Finding . . . was formally adopted a few years later in the Final Policy," Br. 28, the public was told something very different when the Final Policy was actually adopted, i.e., that the SPR "threshold *should be lower than in the draft policy to ensure that species with important populations that are facing significant threats receive protection under the Act*."  79 Fed. Reg. at 37,595 (emphasis added); *see also id*. at 37,581 ("*[T]he lower threshold for 'significant' in this final policy will further the conservation purposes of the statute beyond that already embodied in the draft policy because it will enable us to provide protection under the Act to species with important populations facing significant threats that we might not have otherwise listed*") (emphasis added); *id*. at 37,595 ("*we have lowered the threshold for 'significance'*'") (emphasis added); *id*. at 37,579 (the "revised definition will . . . *[l]ower and simplify the threshold for 'significant' . . . A lower threshold will further the conservation purposes of the statute and more clearly avoid the*

*appearance of similarity to the 'clarification' approach*") (emphasis added); *id.* at 37,581 ("[W]e *have lowered the threshold for 'significant' somewhat* by incorporating the concept of being likely to become in danger of extinction in the foreseeable future (the threatened standard) along with the standard for endangered in the definition of 'significant.' *Use of the somewhat lowered threshold furthers the conservation purposes of the statute and more clearly avoids the appearance of similarity to the 'clarification' approach . . . .*").[1]

Accordingly, the government's argument that *Chevron* "deference" is "owed an interpretation that is subsequently adopted through notice-and-comment rulemaking," Br. at 28, has no legal or logical applicability to the situation here, in which the SPR interpretation applied to the pygmy-owl finding not only conflicted with the agency's *prior* interpretation and was *never* "formally adopted through notice-and-comment rulemaking," but was "subsequently" declared by the FWS itself to establish too high a substantive threshold for listing. Not surprisingly, therefore, defendants do not cite a single precedent that supports affording *Chevron* deference under these circumstances. To the contrary, the government mistakenly relies on *WildEarth Guardians v. Jewell*, 134 F. Supp. 2d 3d 1182 (D. Ariz. 2015) – which addressed an issue (how historic range should be treated in listing decisions) that has nothing to do with this case, *see* Plf. Br. 25 n.12 – for the proposition that an "earlier interpretation and application of the ESA's SPR phrase that is *consistent with the Final Policy* is owed *Chevron* deference." Br. 27 (emphasis added). The unavoidable implication of *WildEarth Guardians*, therefore, is that an "interpretation and application of the ESA's SPR phrase" that the Service has declared to be *different from* the Final Policy – i.e., the substantive threshold for

---

[1] The government asserts that Plaintiffs have somehow "conced[ed] that the interpretation in the draft policy that was published just two months after the Finding was finalized was applied to" the pygmy-owl finding. Br. 29 (citing Plf. Br. 17-18). This is wrong. The pages cited by the government contain no such "concession" and, to the contrary, Plaintiffs specifically argued that the pygmy-owl finding was deserving of no *Chevron* deference precisely because the "Final Policy expressly purports to adopt a *less restrictive* definition that the one applied to the pygmy-owl." Plf. Br. 25.

4

"significance" applied to the pygmy-owl – is owed no such deference.[2]

By the same token, none of the other cases cited by the government (at 27-28) – which simply address situations in which an agency codifies an "interpretation of 'longstanding' duration," *Barnhart v. Dalton*, 535 U.S. 212, 220 (2002) (internal quotation omitted), or has adopted a regulation in response to litigation, *see Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744 & n.3 (1996) – has anything to do with the situation here, in which the government is asking for deference for an agency interpretation that was never adopted pursuant to any "relatively formal administrative procedure" such as "notice-and-comment rulemaking,'" *Encino Motorcars LLC v. Navarro*, 579 U.S. ___, 136 S. Ct. 2117, 2125 (2016), and that the agency itself subsequently declared did not sufficiently further the "conservation purposes of the statute. 79 Fed. Reg. at 37,581.[3]

---

[2] As explained in Plaintiffs' opening brief, *see* Plf. Br. 25 n.12, the issue in *WildEarth Guardians* was different from the one here for an additional important reason: the FWS's approach to the historic range issue in the Final Policy was "not displacing any prior agency interpretation." *See WildEarth Guardians*, 134 F. Supp. 3d at 1192-93. Indeed, the M-Opinion took the same approach to that issue that was embodied in the Final Policy. *Compare* 79 Fed. Reg. at 37,609 (Final Policy) ("Lost historical range is relevant to the analysis of the status of the species, but it cannot constitute a significant portion of a species' range."), *with* SPR-434-35 (M-Opinion) ("Data about the historical range and how the species came to be extinct in that location may be relevant in understanding or predicting whether a species is 'in danger of extinction' in its current range. But the fact that it has ceased to exist in what may have been portions of its historical range does not necessarily mean that it is 'in danger of extinction' in a significant portion of its current range."). In contrast, the definition of "significant" adopted in the final rule not only differs from the one in the draft policy that was applied to the pygmy-owl, but also deviates dramatically (without any explanation) from the interpretation published by the Solicitor of the Interior Department and applied in multiple FWS listing decisions. *See* SPR-431 (M-Opinion) (rejecting an SPR approach under which a portion of a species' range must be so important that its loss would place the species "in danger of extinction throughout its entire range" because this approach "would severely diminish the Secretary's ability to achieve one of the primary objectives of the ESA, which is to '[safeguard], for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.'") (quoting 16 U.S.C. § 1531(a)(5). Hence, unlike the issue before the court in *WildEarth Guardians*, the Final Policy *did* "displac[e] a 'prior agency interpretation'" of "significant," 134 F. Supp. 3d at 1192-93, that was in fact applied by the FWS to determine that a number of species were "threatened or endangered in a significant portion of their ranges." SPR-79546; *see also infra* at 31 (explaining how the M-Opinion was treated as binding policy by the FWS).

[3] The government argues that *Encino* has no application here because the "interpretation applied in the [pygmy-owl] Finding . . . was formally adopted a few years later in the Final Policy" and because *Encino* "did not address the deference owed an

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.   PLAINTIFFS HAVE NOT "WAIVED" ANY CHALLENGE TO THE PYGMY-OWL FINDING.

Because defendants have no coherent legal rationale for why the Court should afford deference to the SPR interpretation in the pygmy-owl finding, defendants also try a different tack.  The government asserts that Plaintiffs' challenge to the pygmy-owl finding merely "mirrors its challenge to the Final Policy," Br. 27, and that Plaintiffs have somehow "waived any argument," *id*. at n. 8, based on the specific application of the SPR interpretation applied to the pygmy-owl.  But this distorted recitation of Plaintiffs' arguments has no more validity than defendants' rationale for deference.

While Plaintiffs have certainly argued that the refusal to list the pygmy-owl and the Final Policy suffer from overlapping legal flaws – including the total disregard in both decisions for the importance of protecting imperiled species *in the United States* – Plaintiffs made crystal-clear in their opening brief that the pygmy-owl finding is legally vulnerable for *additional* reasons that are specific to the anomalies of the pygmy-owl finding that admittedly "important" parts of the species' range do not qualify as "significant."  In terms of the SPR definition, Plaintiffs emphasized that the "Final Policy expressly purports to adopt a *less restrictive* definition than the one applied to the pygmy-owl," and that the "FWS cannot, in any event, be afforded deference for its pygmy-owl finding based on a subsequent interpretation that the Service itself claims to be '[s]ubstantively' *different* from the one applied to the pygmy-owl."  Plf. Br. 25 (quoting 79 Fed. Reg. at 37,578); *see also id*. (explaining that the FWS represented in the Final

interpretation that is later formally adopted through notice-and-comment rulemaking."  Br. 28.  Again, however, the government appears to be confusing wish with reality because, as the government admits elsewhere in the same brief, the interpretation applied to the pygmy-owl was explicitly *not* adopted in the Final Policy and hence was *never* "adopted through notice-and-comment rulemaking."  *See* Br. 9-10 & n.8 ("Under the Final Policy, FWS now considers whether the rest of the range would be endangered <u>or</u> threatened if the portion of the range at issue were extirpated," while in the pygmy-owl decision, the "FWS only assessed whether the rest of the range would be endangered if the population were extirpated").  Consequently, *Encino* applies squarely to the pygmy-owl finding, which applied an interpretation that admittedly diverges from the Final Policy and instead applied a "draft" interpretation that went through no formal process.

1   Policy that it had adopted a "lower threshold" for significance than that applied to the

2   pygmy-owl, so as to "'more clearly avoid the appearance of similarity to the

3   'clarification' approach'" rejected by the Ninth Circuit).

4          In addition, Plaintiffs argued in their opening brief that "for the FWS to

5   'acknowledge' that a gravely imperiled portion of the pygmy-owl's habitat is in fact

6   'important' to conservation of the 'taxon as a whole' as well as the Western DPS –

7   including because of the ability of the owl 'to adapt to impacts from climate change may

8   be *substantially reduced*' with the loss of the Sonoran Desert Ecoregion – yet nonetheless

9   find that the area is not 'significant' enough to afford the pygmy-owl *any* protection

10  under the ESA, is to undermine Congress's purpose and to stand the ESA's policy of

11  'institutionalized caution' on its head." Plf. Br. 28.  Further highlighting the illegality

12  and arbitrariness of the determination specific to the pygmy-owl, Plaintiffs pointed out

13  that "even in explaining the Final Policy, the FWS used as an example of a 'portion of the

14  species range' that *should* qualify as an SPR an area that is 'important to conservation of

15  the species' because it is a potential '*refugia from climate change*,'" which is "precisely

16  how the Service has characterized the Sonoran Desert Ecoregion while simultaneously

17  deeming it 'non-significant' for listing purposes."  *Id.* at 28 n.14 (internal quotations

18  omitted).[4]

19         In short, Plaintiffs have "waived" nothing.  Plaintiffs' opening brief makes clear

20  that while both the FWS's refusal to list the pygmy-owl and the Final Policy are legally

21  infirm, the fact that the FWS admittedly did not even apply to the pygmy-owl what the

22  FWS itself represented as a "lower threshold" in the Final Policy that was needed to

23  protect "important populations facing significant threats that we might not have otherwise

24  listed," 79 Fed. Reg. at 37,581, means that the FWS cannot receive deference for the

25  _____

26         [4] Strangely, the government concedes that Plaintiffs' brief "highlight[ed]" these and
    other statements in the pygmy-owl finding, and yet nonetheless insists that Plaintiffs do
27  "not go so far as the challenge the FWS's finding . . ." Br. 35.  In fact, Plaintiffs highlighted
    these aspects of the pygmy-owl finding because Plaintiffs most certainly *are* challenging
28  the pygmy-owl finding, *both* because it shares legal defects with the Final Policy *and*
    because it did not even apply the significance threshold in the Final Policy.

approach adopted in the internally contradictory pygmy-owl finding and that, at minimum, the pygmy-owl finding must be vacated and remanded for further consideration by the Service.  *See also* Plf. Br. 32 (explaining that the Final Policy's "protestation that this change was made to 'more clearly avoid the appearance of similarity to the 'clarification' approach" rejected by the Ninth Circuit" is tantamount to a "concession that the draft policy applied to the pygmy-owl finding *does* run afoul of the Ninth Circuit analysis").

Simply put, as a matter of rudimentary law and logic, the FWS and NAHB cannot *simultaneously* defend as "reasonable" what the FWS itself has publicly characterized as two *substantively different interpretations of the very same statutory phrase*.  If, as the FWS maintains, it is appropriate in making an SPR determination to "consider[] whether the rest of the range would be endangered <u>or</u> threatened if the portion of the range at issue were extirpated," Br. 10 n.8, and yet the Service concededly did not consider *at all* whether the rest of the range of the pygmy-owl (or the Western DPS) would be *threatened* if the Sonoran Desert Ecoregion were extirpated, it unavoidably follows that the pygmy-owl finding *must* be deemed to have been based on an unreasonably narrow construction of the statute.

Moreover, the government's assertion that Plaintiffs have "waived any argument regarding whether the remaining range would be threatened if the [Sonoran Desert Ecoregion] portion were extirpated," Br. 10, not only ignores those portions of Plaintiffs' opening brief that expressly argue that the FWS cannot rely on the Final Policy to defend the pygmy-owl decision, but also puts the legal cart before the horse.  Plaintiffs have argued that the *legal standard* applied to the pygmy-owl decision is unlawfully narrow, and that even the agency's own Final Policy concedes as much.  Consequently, the critical issue at this juncture is not, as the government would have it, whether the "significance threshold was . . . *correctly applied*," Br. 35 (emphasis added), but, rather, the more basic question of which "significance threshold" *was* applied to the pygmy-owl finding and whether *that* threshold is legally sustainable, especially in view of the *FWS's*

*own subsequent determination that the threshold had been set too high.* If the Court agrees with Plaintiffs that the pygmy-owl finding cannot be sustained under these circumstances, the appropriate remedy is for the Court to remand the pygmy-owl finding to the Service for it to engage in more reasoned decisionmaking and not, as the government appears to believe, for the Court to make its *own* determination in the first instance as to whether the pygmy-owl satisfies a different SPR standard *than the one actually applied by the Service in denying listing. See National Association of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644, 657 (2007) ("*NAHB I*") (explaining that if an agency has taken inconsistent positions regarding its statutory obligations, the appropriate recourse is to remand for the agency to "explain[] and reconcil[e] the arguably contradictory rationales").

C.   **THE GOVERNMENT'S CONCESSION THAT THE FWS MADE A "CLOSE CALL" AGAINST THE PYGMY-OWL, WHILE APPLYING AN SPR STANDARD THAT THE FWS ITSELF ULTIMATELY DETERMINED SET TOO HIGH A BAR, <u>NECESSITATES A REMAND OF THE PYGMY-OWL FINDING.</u>**

That a remand of the pygmy-owl finding is unavoidable also stems from the government's remarkable concession that the Service's failure to list based on the species' status in the Sonoran Desert Ecoregion "***admittedly . . . could be considered a close call,***" Br. 33 (emphasis added), especially in view of the Service's acknowledgement that the loss of this portion of the species' range "might reduce the viability and potential for long-term survival of the remaining portion of the DPS" and might "substantially decrease the genetic diversity of the overall DPS to the point that the pygmy-owl *may* not be able to adapt to what *may* be the predominant vegetation community under the predicted effects of climate change." *Id*. This concession also compels rejection of the government's contention that "even if the Court agreed with [plaintiffs] that the SPR assessment in the [pygmy-owl] finding was not owed any deference and was unreasonable, the error was harmless because remanding the Finding back to the FWS for consideration under the Final Policy would be a waste of time and

resources . . . ."  Br. 29.

If it was a "close call" even when the FWS applied an SPR threshold that the Service itself subsequently concluded had been set too high and hence claimed to have "[l]ower[ed] and simplif[ied]" so that "*more species with important populations that are facing substantial threats*" might be listed, 79 Fed. Reg. at 37,579 (emphasis added), defendants cannot consistently argue at the very same time that it is a foregone conclusion that the pygmy-owl would not be one of the species that would warrant listing under the purportedly "lowered and simplified" standard the Service ultimately declared to constitute its (latest) "reasonable" construction of the SPR phrase.  This is especially so in view of the fact that the FWS declared the Sonoran Desert Ecoregion "important" to the pygmy-owl as a whole as well as the western DPS precisely because of the Ecoregion's increasing value as climate change affects other portions of the species' range, i.e., the very "refugia from climate change" that the Service said in the Final Policy *should* qualify an SPR for listing.  SPR-79545; *see also* Int. Br. 27 (stating that the Final Policy adopted a *somewhat lower threshold* than the threshold used in the 12-Month Finding" for the pygmy owl) (emphasis added).

Under these circumstances, the government's assertion that the "same outcome would have resulted" even if the FWS had applied the definition adopted in the Final Policy is not only a flagrant "post hoc decision explanation that is disfavored," *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1072 (9th Cir. 2004), but it requires the Court to disregard the FWS's own repeated representations to the public that the Final Policy *substantively* changed the legal threshold applicable to SPR determinations.  *Id.* at 1071 ("In the context of agency review, the role of harmless error is constrained.  The doctrine may be employed only 'when a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance of decision reached.'") (internal quotation omitted).[5]

---

[5] NAHB asserts that the FWS determined that the "hypothetical loss of the Sonoran Desert pygmy-owl population would not *threaten* the remainder of the pygmy-owl

1   Furthermore, the government's concession that the FWS opted to make an

2   "admittedly . . . close call" *against* protection of the species – using a legal standard now

3   conceded to be overly stringent – underscores the extent to which the FWS has strayed

4   from the ESA's design in refusing to list the pygmy-owl.  As the Ninth Circuit has held,

5   Congress's intention in enacting the ESA was to "'*give the benefit of the doubt to the*

6   *species*.'"  *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (emphasis added)

7   (quoting H.R. Rep. No. 96-697 at 12 (Conf. Rep.), *reprinted in* 1979 U.S.C.C.A.N. 2572,

8   2576).  The FWS, however, "eviscerate[d]" that intent, *Conner*, 848 F.2d at 1454, by, in

9   effect, conceding that it made the final pygmy-owl decision applying the opposite of the

10   "institutionalized *caution*" that Congress intended to guide the FWS's determinations

11   under the Act.  *TVA v. Hill*, 437 U.S. at 194 (emphasis added) (explaining that Congress

12   had made it "abundantly clear that the balance has been struck in favor of affording

13   endangered species the highest of priorities, thereby adopting a policy which it described

14   as 'institutionalized caution.'"); *see also Ctr. for Biological Diversity v. Bureau of Land*

15   *Mgmt.*, 422 F. Supp. 2d 1115, 1127 (N.D. Cal. 2006) ("To the extent that there is any

16   uncertainty as to what constitutes the best available scientific information, Congress

17   intended 'to give the benefit of the doubt to the species'") (internal quotation omitted);

18   *Rock Creek Alliance v. U.S. Fish and Wildlife Serv.*, 390 F. Supp. 2d 993, 1008 (D. Mont.

19   2005) ("a tie in the evidence should go to the species").

20   Not only does the government "admit" that the FWS made what it regarded as a

21   "close call" against affording the pygmy-owl any protection, but defendants also concede

22   that the FWS did so because the science regarding the increasing importance of the

23   Sonoran Desert Ecoregion in an era of accelerating climate change is, not surprisingly,

24   uncertain.  The government emphasizes that the pygmy-owl finding said that loss of the

25

26   population in western Mexico."  Int. Br. 14 (emphasis added).  That is wrong. As the
     government candidly concedes, the FWS *only* "assessed whether the rest of the range

27   would be *endangered* if the population at issue were extirpated" whereas the interpretation
     adopted in the Final Policy requires the FWS to "consider[] whether the rest of the range

28   would be endangered <u>or</u> threatened if the portion of the range at issue were extirpated."
     Br. 10.

Sonoran Desert Ecoregion "'*may provide* important contributions to population numbers, genetic diversity, and status of the pygmy-owl," and that loss of this population "'*might* substantially decrease the genetic diversity of the overall DPS to the point that the pygmy-owl *may* not be able to adapt to what *may* be the predominant vegetation community under the predicted effects of climate change.'"  Br. 33 (emphasis in original; internal quotation omitted); *see also* Int. Br. 15.

In stressing qualifiers such as "may" and "might," however, defendants are not only cherry-picking statements from the final pygmy owl finding, *see, e.g.*, 76 Fed. Reg. at 61,892 ("This population group of pygmy-owls is *likely* to become a more significant contributor to the long-term viability of the species.") (emphasis added); *id*. at 61,892 ("the Sonoran Desert Ecoregion *has unique habitat characteristics*") (emphasis added); *id*. at 61,893 (the "Sonoran Desert Ecoregion *represents an important portion* . . . of the taxon as a whole"), but they are arguing for a far more exacting test for listing than Congress adopted.  The ESA "contains no requirement that the evidence be conclusive in order for a species to be listed" and, to the contrary, "[a]pplication of such a stringent standard violates the plain terms of the statute . . . ."  *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997).[6]

As explained by one court in rejecting the FWS's refusal to list the Canada lynx based on its depleted status in the contiguous U.S. portion of its range:

---

[6] NAHB asserts that Plaintiffs "have ignored the findings" in the final pygmy-owl decision and "instead have culled statements from the draft agency documents and have quoted them out of context."  Int. Br. 11.  In fact, Plaintiffs have relied primarily on the findings in the FWS *final decision*, and particularly the explicit finding that the imperiled Sonoran Desert Ecoregion is in fact "important" to the Western DPS and the taxon as a whole – a finding that NAHB largely ignores and that undermines any notion that listing the pygmy-owl based on its status in the Sonoran Desert Ecoregion would, as NAHB alleges, be "absurd."  Int. Br. 19.  Further, insofar as Plaintiffs have relied on the FWS's draft finding in favor of listing the pygmy-owl based on its status in the Sonoran Desert Ecoregion, it is simply to demonstrate that the FWS's *scientific findings* regarding the pygmy-owl's status have remained unaltered and that only the *legal definition* of "significant" as applied to the facts dramatically changed without adequate justification.  *See* Plf. Br. 6-13.  NAHB admits as much.  *See* Int. Br. 20 (the "reason for the internal change in position *was that the law changed*") (emphasis added).  Hence, this case also has nothing to do with any assertion by Plaintiffs of "some sort of conspiracy to overturn the scientific findings of the agency's expert biologists."  *Id*.

1

2      [t]he "statutory standard, requiring that agency decisions be made on the 'best
       scientific and commercial data available,' rather than absolute scientific
3      certainty, is in keeping with congressional intent in crafting the ESA.  Congress
       repeatedly explained that it intended to require the FWS to take preventive
4      measures *before* a species is 'conclusively' headed for extinction.  The purpose
       of creating a separate designation for species which are 'threatened,' in addition
5      to species which are 'endangered,' was to try to 'regulate these animals before
       the danger becomes imminent while the long-range action is begun.'
6

7    *Id.* at 679-80 (quoting 16 U.S.C. § 1533(b) and S. Rep. No. 307, 93d Cong., 1st Sess. at 3

8    (1973), *reprinted in Legislative History of the Endangered Species Act of 1973, As*

9    *Amended in 1976, 1977, 1978, 1979, and 1980*, at 302); *id.* at 680 ("Judicial and

10   administrative interpretations of the ESA have consistently construed the statute's 'best

11   available data' standard as requiring far less than conclusive evidence . . . The FWS itself

12   has taken the position that it need not, and must not, wait for conclusive evidence in order

13   to list a species."); *see also Northwest Ecosystem Alliance v. U.S. Fish and Wildlife*

14   *Service*, 475 F.3d 1136, 1147 (9th Cir. 2007) (in applying the "best scientific . . . data

15   available standard," the "Service may not ignore evidence simply because it falls short of

16   absolute scientific certainty"); *National Association of Home Builders v. Norton*, 340

17   F.3d 835, 847 (9th Cir. 2003) ("*NAHB II*") (explaining that the FWS can make listing

18   determinations "based on *less than conclusive evidence*" but "cannot base its conclusions

19   on no evidence) (emphasis added).[7]

20       In sum, because the significance threshold applied to the pygmy-owl warrants no

21   *Chevron* deference and is inconsistent with what the FWS itself characterized as a "lower

22

23   _____

24       [7] The government's suggestion that listing the pygmy-owl based on its precarious
     status in the Sonoran Desert Ecosystem would somehow run afoul of the Ninth Circuit's
25   ruling in *NAHB II*, *see* Br. 34-35; *see also* Int. Br. 25, is baseless.  As explained in Plaintiffs'
     opening brief, *NAHB II* is limited to addressing "whether the FWS violated its *DPS*
26   *Policy*," 340 F.3d at 842, by listing the Arizona population as a DPS.  The Ninth Circuit
     also relied on the "common," dictionary definition of words used in the DPS Policy, *see*
27   340 F.3d at 851, which supports Plaintiffs' argument that the FWS's express finding as to
     the "importance" of the Sonoran Desert Ecoregion to the pygmy-owl's conservation is
28   synonymous with that Ecoregion being a "significant" portion of the species' range.  *See*
     Plf. Br. 26-27; *see also infra* at 20.

13

threshold" for listing in the Final Policy, and because the FWS, even in applying the standard in the draft policy, made an "admittedly . . . close call" *against* listing the pygmy-owl, in contravention of Ninth Circuit precedent and Congress's intention to give the benefit of the doubt to the species, the FWS's pygmy-owl finding must be vacated and remanded for these reasons alone.[8]

### D. THE PYGMY-OWL FINDING VIOLATES THE PLAIN MEANING OF THE ESA AND CONTRAVENES CONGRESS'S CORE PURPOSE TO CONSERVE IMPERILED SPECIES FOR THE BENEFIT OF THE "NATION AND ITS PEOPLE."

As set forth in Plaintiffs' opening brief, even if the Court were to afford the pygmy-owl finding *Chevron* deference, the Court could not sustain as "reasonable" the FWS's counterintuitive and counter-textual determination that the Sonoran Desert Ecoregion is in fact "important" to conservation of the pygmy-whole as a whole, as well as the Western DPS, yet is not "significant" for purposes of an SPR finding. *See* Plf. Br. 26. Plaintiffs explained that the FWS itself has conceded, including in adopting the Final Policy, that the words "significant" and "important" are indeed synonymous, so that the FWS's refusal to find an admittedly "important" portion "significant" violates the plain, ordinary meaning of the statutory language. *Id*. at 26-27. Plaintiffs further explained that the FWS's failure to afford any consideration whatsoever to the value of protecting the pygmy-owl in Arizona for the benefit of the "Nation and its people," 16 U.S.C. § 1531(a)(3), flouts the overriding design of the statute, as unequivocally expressed by Congress, to address the crisis of "various species of fish, wildlife, and plants *in the United States*" being "rendered extinct as a consequence of economic growth and development untampered by adequate concern and conservation." *Id*. § 1531(a)(1); *see* Plf. Br. 28-29. Defendants have no convincing rebuttal to these arguments.

Rather, the government appears to concede, as it must, that "important" *is* the

---

[8] For these and other reasons set forth by Plaintiffs, the pygmy-owl finding is also not entitled to "*Skidmore* deference." *See* Plf. Br. 26 n. 13.

"dictionary definition of 'significant.'"  Br. 30.  Nor do defendants dispute that the FWS expressly and unequivocally found that the "Sonoran Desert Ecoregion represents an *important portion of the Western DPS, and of the taxon as a whole*."  76 Fed. Reg. at 61,893 (emphasis added).  Consequently, to avoid the seemingly unavoidable conclusion that the pygmy-owl finding violates the ordinary, plain meaning of the statutory language used by Congress, the government argues that the "definition of 'significant'" applied to the pygmy-owl finding "*struck an appropriate balance* between giving the SPR phrase independent meaning and minimizing the degree to which restrictions would be imposed and resources expended unwisely."  Br. 31 (emphasis added).

This response, however, as much as acknowledges that the pygmy-owl finding deviated from the ordinary meaning of statutory language based on the agency's own policy preferences for how its "resources" should be expended.  But that is an impermissible approach to statutory interpretation, as the Supreme Court has "stated time and again."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (emphasizing that agencies and courts "must presume that a legislature says in a statute what it means and means in a statute what it says there."); *see also Utilities Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2466 (2014) (explaining that an agency may not rewrite statutory language "to suit its own sense of how the statute should operate"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law"); *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) ("In the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning").

In any case, the Final Policy itself also compels rejection of the government's assertion that the "definition of 'significant'" applied in the pygmy-owl finding "struck an appropriate balance."  Br. 31.  Once again, the FWS *declined* to adopt the draft interpretation applied to the pygmy-owl finding because, according to the Service, a

"lower threshold" was needed to "further the conservation purposes of the statute," 79 Fed. Reg. at 37,579, and because the "draft policy" did *not* "ensure that species with *important populations* that are facing significant threats" – including, specifically, from climate change – "receive protection under the Act . . . ." *Id.* at 37,595 (emphasis added). Under these circumstances, even if the FWS was at liberty to adopt an interpretation at odds with the ordinary meaning of the statute, which it was not, the FWS cannot contend that the approach it took in the pygmy-owl finding reflected an "appropriate balance."

As for the Service's failure to accord any weight at all to the value of conserving the pygmy-owl in Arizona, the government flatly concedes that "although Congress included findings stating the importance of wildlife *to the Nation*," Br. 21 (emphasis added), both under the approach the FWS took in the pygmy-owl finding and in the Final Policy, the value of protecting imperiled species *in the United States* was not afforded even the slightest consideration. *See* Br. 21.[9]

The government argues, however, that "[c]ontrary to [Plaintiffs'] assertions, nowhere does Congress state that the purpose of the ESA is to protect every single population in the United States from extirpation," and that "Congress chose not to include any provisions requiring FWS to consider the status of a species within U.S. boundaries in isolation of its status outside those borders." *Id.* at 23. These arguments both misstate

---

[9] Defendants point out that there are some "pygmy owls in Texas" as well as Arizona, Br. 22, but do not dispute that the importance of preserving the species in the United States played no role whatsoever in the FWS's analysis of whether the species is endangered or threatened in a "significant" portion of its range. The government also asserts that, "[a]lthough the Arizona population faces threats, it is not a *foregone conclusion* that this population will be extirpated," Br. 22 n.15 (emphasis added), without disputing that the Arizona population has plummeted to a handful of animals in the absence of ESA protection and that the Service's own biologists have concluded that the pygmy owl is indeed "endangered" – i.e., facing *extinction* in the foreseeable future – in the portion of its range that encompasses Arizona. *See* Plf. Br. 6-7. Still more perplexing, the government points to an ESA "incidental take permit" that was recently approved by the FWS that, according to the government, is "meant to protect *ESA-listed species, such as the pygmy owl and ensure compliance with the ESA* in areas such as Pima County, Arizona." *Id.* (emphasis added) (citing 81 Fed. Reg. at 29,907). But since the FWS *refused* to list the pygmy-owl and hence "take" of the species – through habitat destruction or any other means – is not in any way prohibited by the ESA, the government's citation to an ESA permit "meant to protect ESA-listed species" makes no sense.

Plaintiffs' argument and set forth a misleading characterization of the issue before the Court.

Plaintiffs have not argued that Congress required the FWS to "protect every single population in the United States."  Rather, Plaintiffs' more modest, but legally compelling, argument is that an interpretation of "significant" in the SPR phrase that *assigns no weight whatsoever to the value of protecting species in the United States* is not a reasonable interpretation insofar as it completely ignores a central purpose of the Act as explicated by Congress.  *See* Plf. Br. 28-30.  As Plaintiffs explained in their opening brief – with no rebuttal from defendants – Supreme Court and Circuit precedent dictate that an agency's interpretation of statutory language is "unreasonable" for *Chevron* (or any other) purposes if, among other reasons, it "frustrate[s] the policy Congress sought to implement" in the statute.  *Pac. Nw. Generating Cooperative v. Dep't of Energy*, 580 F.3d 792, 806, 812 (9th Cir. 2008).  And, in assessing whether an interpretation is consistent with Congress's purpose, courts look first and foremost to the Congressional findings and statement of purpose explicated in the statute itself.  *See, e.g.*, *State of Cal. Dep't of Soc. Serv. v. Thompson*, 321 F.3d 835, 851 (9th Cir. 2003) (rejecting interpretation under *Chevron* step two and adopting interpretation that comported with the "congressional declaration of purpose" as explicated in the statute).

Here, while the government asserts that the "Congressional findings and policy statements in the ESA do not go nearly as far as [Plaintiffs] claim," Br. 22, Congress could hardly have been clearer in explicating its design to safeguard species that are of "esthetic, ecological, educational, historical, recreational, and scientific *value to the Nation and its people*"; to prevent the extinction of "various species of fish, wildlife, and plaints *in the United States*"; and to "better safeguard[], *for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants*."  16 U.S.C. §§ 1531(a)(1)-(3), (5) (emphasis added).  That Congress *also* stated that the ESA was designed to effectuate "international treaties," as Defendants point out, Br. 23, in no way diminishes Congress's emphatic concern with species protection *in the United States*.  As the M-Opinion

17

1  explained, "to read the SPR phrase . . . as requiring that a species be endangered of

2  extinction throughout its entire range before it could be considered 'endangered' for

3  purposes of the ESA *would severely diminish the Service's ability to achieve one of the*

4  *primary objectives of the ESA,* which is to [safeguard], for the benefit of all citizens, the

5  Nation's heritage in fish, wildlife, and plants.'"  SPR431 (emphasis added) (quoting 16

6  U.S.C. § 1531(a)(5)).

7        Defendants concede that Congress "addressed the general status of species in the

8  United States *and discussed the importance of these species to the Nation in ESA Section*

9  *2,*" Br. 24 (emphasis added), but Defendants nonetheless insist that this conceded

10  "importance" should play no role in the FWS's determination of whether a portion of a

11  species' range should be deemed "significant" because Congress "omitted any

12  geographic-specific conditions in Section 4," *id*., which sets forth the process and

13  timetable for listing endangered and threatened "species."  What this argument overlooks

14  – in addition to the fact that Congress was not obligated to *reiterate* the ESA's core

15  purpose in every section of the Act – is that the statutory phrase at issue does not even

16  appear in section 4.  Rather, it is in the Act's definition section (section 3) which *defines*

17  an "endangered species" as one which is "in danger of extinction throughout all *or a*

18  *significant portion of its range*," and a "threatened species" as one that is "likely to

19  become an endangered species within the foreseeable future throughout all *or a*

20  *significant portion of its range*."  16 U.S.C. §§ 1532(6), (20) (emphasis added).  Given

21  defendants' admission that Congress emphasized the "importance of these species *to the*

22  *Nation in Section 2*," Br. 30 (emphasis added) – which delineated what Congress

23  intended to accomplish in *all* of the ESA's provisions – it was palpably *unreasonable*

24  and, indeed, "manifestly contrary" to the statutory scheme as a whole, *Environmental*

25  *Defense Center, Inc. v. EPA*, 344 F.3d 832, 857 (9th Cir. 2003), for the FWS to adopt of

26  an interpretation of a "significant portion" so that the legislatively-declared "importance

27  of these species *to the Nation*," Br. 30 (emphasis added), has absolutely **zero** bearing on

28

an SPR determination.[10]

There is also no merit to the government's argument that because the "FWS has determined that it is appropriate to consider international boundaries when identifying *DPSs*," this somehow displaces the need to consider the national value of protecting species in delineating significant portions of species' ranges. Br. 25. In fact, the opposite is true. The FWS's approach to the DPS issue both undercuts any possible legal objection to listing species based on their unique importance to the "Nation and its people," 16 U.S.C. § 1531(a)(3), and also reinforces the vital importance of reading the SPR phrase to incorporate that consideration.

As explained in Plaintiffs' opening brief (at 3), the FWS's DPS Policy requires the Service to consider whether (1) a particular population segment is "discrete" in "relation to the remainder of the species to which it belongs" and (2) the population segment is "significant to the species to which it belongs." 61 Fed. Reg. 4,722, 4,725. The government acknowledges that, as a "'matter of policy,'" the FWS's "assessment for discreteness takes into consideration 'international governmental boundaries,'" notwithstanding the fact that this assessment adds a "'non-biological element to the recognition of DPS's.'" Br. 25 (internal quotation omitted). Thus, the Service cannot (and does not) maintain that Congress limited the FWS to purely biological factors in delineating what constitute "species" for purposes of ESA listing.[11]

---

[10] Although the specific issue before the Court is how the SPR phrase in section 3 of the ESA should be construed, even the section 4 provisions highlighted by Defendants reinforce the unreasonableness of the FWS's approach. Defendants refer to the section 4(b) requirements that the FWS must give "consideration to species that have been 'identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency,'" and that the Service must "'tak[e] into account those efforts, if any, being made by a State or foreign nation, or any political subdivision of a State . . . .'" Br. 24 (quoting 16 U.S.C. §§ 1533(b)(1)(A), (b)(1)(B)(ii)). These references to the role of states reinforce that while the ESA's objectives were not *limited* to avoiding the loss of species in the U.S., that was undoubtedly a central concern of Congress.

[11] Accordingly, NAHB's argument that the "best available" science standard in section 4 of the ESA – which applies when the FWS is determining *whether* a species as defined by the Act qualifies for listing – somehow forecloses the Service from taking the value of protecting wildlife in the U.S. into account in determining *what* qualifies as a "species" as a threshold matter, *see* Int. Br. 7, 9-10, 30 conflicts with the government's

At the same time, by requiring that a DPS also be "significant *to the species to which it belongs*," 61 Fed. Reg. 4,725 (emphasis added), the DPS Policy precludes the FWS from basing a *DPS determination* on the value of protecting the pygmy-owl in the U.S.  That is why *NAHB II* held that the precarious status of the pygmy-owl in Arizona could not support a DPS determination notwithstanding the court's recognition that "extirpation of the western pygmy-owl from the United States is *certainly significant to the United States*."  340 F.3d at 849 (emphasis added).  Indeed, the Court of Appeals stressed that "[h]aving chosen to promulgate the *DPS Policy*" in the manner that it did, "*the FWS must follow that policy*" irrespective of the "certain significan[ce]" of the pygmy-owl to the United States.  *Id.* at 852 (emphasis added).[12]

The Ninth Circuit's holding that the Service was constrained to follow the DPS policy that the agency itself "chose" to issue does not mean that the Service should (or may) define "significant portion of its range" – a phrase that, as the government concedes, was "never directly addressed" in *NAHB II*, Br. 26 – in a manner that fails to embody Congress's clearly expressed intent to stem the loss of species "in the United States" 16 U.S.C. § 1531(a)(1).  To the contrary, especially in view of how the FWS has opted to address the DPS issue, the *only* means available to the agency to take this

_____

position as well as Congress's express desire to safeguard imperiled "fish, wildlife, and plants *in the United States*" for the benefit of the "Nation and its people."  16 U.S.C. §§ 1531(a)(1)-(3) (emphasis added).  Indeed, in adopting the Final Policy, the FWS conceded that "[w]e could use these values [in section 2 of the Act] to define whether a portion is significant," 76 Fed. Reg. at 77,000, and that such an approach would *not* be "inconsistent with the statutory language of the Act."  *Id.* at 77,001.

[12] NAHB erroneously relies on a cursory unpublished Memorandum issued by the Court of Appeals affirming the FWS's finding subsequent to *NAHB II* that the pygmy-owl in Arizona did not constitute a *DPS* for listing purposes – an issue not before the Court here.  *See* Int. Br. 25-26 (citing *Nat'l Ass'n of Home Builders v. Kempthorne*, No. 07-15854, 2009 WL 226048 (9th Cir. Jan. 30, 2009)) ("*NAHB III*).  Under Ninth Circuit rules, "[u]npublished dispositions and orders of [the Court of Appeals] *are not precedent,* except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  Ninth Cir. R. 36-3(a) (emphasis added).  None of those exceptions is applicable.  *NAHB III* did not even mention the statutory language at issue in this case, let alone analyze whether the interpretation of "significant" in the SPR phrase should take into account the Congressional purposes set forth in section 2 of the Act.  Nor did *NAHB III* even address the Sonoran Desert Ecoregion – the portion of the pygmy-owl range at issue here.  Consequently, the Memorandum is "not precedent" under Ninth Circuit rules and, in any event, has no relevance to the issue here.

20

1   legislative purpose into consideration in the listing process is through the agency's SPR

2   analysis.  *See* Plf. Br. 30 n. 15.  Accordingly, the FWS's insistence on *entirely*

3   discounting, in its determination of whether a range portion is "significant," "the value to

4   the Nation and its people," 16 U.S.C. § 1531(a)(3), of conserving species such as the

5   pygmy-owl in the U.S., cannot be sustained as a "reasonable" interpretation or

6   application of the ESA.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467

7   U.S. 837, 842-43 (1984).[13]

8

9   **II.     THE FINAL POLICY DOES NOT ADOPT A REASONABLE**
        **INTERPRETATION OF THE SPR LANGUAGE.**

10          Plaintiffs argued in their opening brief that while the Final Policy adopted a

11  somewhat less stringent standard than that applied to the pygmy-owl, the interpretation

12  ultimately approved nevertheless is flatly "foreclose[d]," *National Cable &*

13  *Telecommunications Association v. Brand X Internet Service*, 545 U.S. 967, 982-83, 986

14

15  _____

16          [13] The government argues that the FWS stated, in adopting the Final Policy, that
    "taking a values approach would require application of highly subjective standards and
17  could potentially result in the agencies applying protection and conservation resources
    when the portion of the range that is endangered or threatened is not biologically important
18  to the conservation of the species."  Br. 22.  That affords no basis for the FWS's refusal to
    list the pygmy-owl given the Service's findings that the imperiled Sonoran Desert
19  Ecoregion, including Arizona, *does in fact* represent a biologically "important portion of
    the western DPS and of the taxon as a whole," and is "likely to become a more significant
20  contributor to the long-term viability of this species."  76 Fed. Reg. 61,892, 61,893. As a
    general matter, while the Final Policy alludes to the "subjective" nature of evaluating
21  "whether a species has cultural, aesthetic, educational, historical, or recreational value,"
    the FWS also acknowledged that an "analysis could be developed in such a way as to result
22  in consistent applications." *Id*. at 77,001.  Further, an approach under which the FWS *takes
    into consideration* – rather than disregards – the statutory objective of "better safeguarding
23  . . . the Nation's heritage in fish, wildlife, and plants," 16 U.S.C. § 1531(a)(5), would
    *complement*, not displace, an assessment of the extent to which the U.S. portion of a
24  species' range is "biologically important to the conservation of the species."  Br. 22; *see
    also* SPR-437 (M-Opinion) ("[I]n defining what portion of a range will be considered
25  'significant,' it is appropriate for the [FWS] to consider factors other than just the size of
    the portion in relation to the current range as a whole . . . For example, the [FWS] could
26  consider, among other things, the portion of the range in terms of the biological importance
    of that portion of the range to the species ***and in terms of the various values listed in the***
27  ***Act that would be impaired or lost if the species were to become extinct in either that***
    ***portion of the current range*** or the current range as a whole.") (emphasis added).

28          .

21

(2005), by the Ninth Circuit's analysis in *Defenders* because it violates elementary axioms of statutory construction by affording the SPR phrase little if any independent meaning as a practical matter.  Plf. Br. 31-32.  Plaintiffs explained that, as a matter of basic logic, if (1) a portion of a species' range is so essential that its loss will render the entire species "either endangered *or* threatened," 79 Fed. Reg. 37,579, and (2) the portion itself is *presently* endangered or threatened with extirpation, then it is difficult if not impossible to discern any real-world situations in which a species could be deemed endangered or threatened in an SPR, but not in "all" of its range – precisely the fatal legal flaw that doomed the FWS's approach in *Defenders*.  Plf. Br. 32.  Plaintiffs also pointed out that throughout the proceedings leading up to and including adoption of the Final Policy the FWS was unable to pinpoint a single species that the FWS would actually list under the Final Policy that would not otherwise qualify for listing, and that the hypothetical "example" relied on by the agency simply underscored the extent to which the Service's approach conflated the SPR basis for listing with the "all" component of the statutory definition.  *Id* at 33 & n.16.  Defendants have no effective response.

## A.   THE PERTINENT LEGAL QUESTION IS WHETHER THE FWS HAS ADOPTED A REASONABE INTERPRETATION.

As an initial matter, Defendants erroneously contend that Plaintiffs "bear[] the burden of showing that 'no set of circumstances exists' under which this legally binding Policy would be valid."  Br. 10.  That is not the legal test that applies in this Circuit to the Court's assessment of whether the Final Policy reflects a reasonable interpretation of the ESA.  Rather, as the cases cited by the government reflect, the "no set of circumstances" test applies when courts are considering certain types of *constitutional* challenges to a legislative enactment.  *See Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (applying "no set of circumstances" test to a Supremacy Clause and preemption challenge to an Arizona statute); *Lanier v. Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008) (addressing whether a city's drug testing policy violated the Fourth Amendment).

In contrast, when assessing whether a federal agency has adopted a valid

interpretation of a statute, courts in this Circuit apply the standard administrative law principles applicable to reviewing agency action, i.e., they analyze whether the agency has acted in a manner that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," 5 U.S.C. § 706(2), and, where the interpretation has been adopted following notice and comment proceedings, the courts apply the *Chevron* framework to ascertain whether the agency's interpretation reflects a reasonable interpretation of Congressional intent.  *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1024 (9th Cir. 2007) (explaining that the Court of Appeals has "on many occasions applied the *Chevron* test to facial challenges to agency regulations with no mention of the 'no set of circumstances' test") (citing cases); *see also Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 878, 881 (9th. Cir. 2005) (applying *Chevron* to hold that an agency regulation implementing the Magnuson-Stevens Act "was based on an impermissible construction of the Act" and was "patently unreasonable" because it did not further Congress's objective to rebuild fish stocks, without any discussion of whether there was any set of circumstances under which the agency's approach could be employed); *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 857-58 (9th Cir. 2003) (applying "*Chevron* step two" to hold that although Congress had "not directly addressed the question of what would constitute a [Notice of Intent] being 'available to the public,'" the EPA's interpretation was "manifestly contrary to the Clean Water Act, which contemplates greater scope, greater certainty, and greater uniformity of public availability," without any discussion of whether there was any set of circumstances under which EPA's approach could be valid).

**B.   THE DEFINITION OF "SIGNIFICANT" IN THE FINAL POLICY SUFFERS FROM THE SAME FATAL LEGAL FLAW AS THE APPROACH REJECTED BY THE NINTH CIRCUIT IN *DEFENDERS.***

The government argues for an inapt legal test because defendants cannot establish that the approach in the Final Policy represents a reasonable interpretation, especially in view of the Ninth Circuit's ruling that the FWS may not, under established rules of

1   statutory construction, "read[] 'all' and 'a significant portion of its range' as functional

2   equivalents" and may not "view[] the statute as saying the same thing twice." *Defenders*,

3   258 F.3d at 1142.  The government concedes that the "SPR language *must provide an*

4   *independent basis for listing*."  Br. 12 n. 10 (emphasis added).  Yet, as in the Final Policy

5   itself, defendants have failed to explain coherently how an approach that demands an

6   imperiled SPR be so critical that its anticipated loss results in the *entire species being*

7   *endangered or threatened* is anything other than the "functional equivalent" of analyzing

8   whether the species itself is endangered or threatened in "all" of its range.  The

9   unavoidable reality is that, although Defendants profess adherence to the Ninth Circuit's

10  analysis, this is no more than window dressing because the approach adopted in the Final

11  Policy suffers from the same legal flaw discerned by the Court of Appeals.

12          Defendants concede that the FWS failed, in adopting the Final Policy, to identify

13  even a single real-world species that would be listed in accordance with the approach

14  adopted in the Policy that could not otherwise be listed under the "all" component of the

15  "species" definition.  Br. 11.  Instead, Defendants seek to justify that omission by

16  asserting that it would be "improper for the Services to make such statements without

17  first reviewing the status of a species based on the best available science and allowing the

18  public and allowing the public an opportunity to comment . . . ."  Br. 11.  This is

19  diversionary.  Regardless of whether the Service might legitimately avoid addressing how

20  particular species that are presently *unlisted* might be analyzed under the Final Policy,

21  nothing precluded the agency from documenting in the Final Policy – if it could – how

22  the more than 2,200 species *previously listed* by the FWS as endangered or threatened,

23  *see* http://ecos.fwsgov/ecpO/reports/box-score-report, would have fared under the Final

24  Policy, i.e., which if any of them would have been listed based on their status in a

25  portion, rather than "all," of their ranges.  Yet the Service made no such showing

26  notwithstanding myriad public comments urging it to do so.

27          In sharp contrast, the record demonstrates that, pursuant to the approach in the M-

28  Opinion, the FWS was able to list a number of species based on their status in a

significant portion of their ranges and *without* analyzing whether the portion was so important that, without it, the entire species would be endangered or threatened. *See* SPR-79546 (explaining that the FWS applied the approach in the M-Opinion in determining that "5 species were threatened or endangered in a significant portion of their ranges"); *see also* Plf. Br. 16 n. 8. In addition, conservation organizations, scientists, and other commenters pointed out that iconic species on the American landscape – such as the grizzly bear, wolf, and bald eagle – were listed based on their imperiled status in the contiguous U.S. irrespective of the fact that they were more abundant elsewhere. *See id*. 32-33.[14] In brief, while the administrative record on which the Court must base its assessment of the Policy's legality contains *no evidence whatsoever* that the interpretation adopted in the Final Policy adds anything of substance to the "all" portion of the species definition, the record also demonstrates that other approaches the FWS has employed in the past have not suffered from that fatal defect.

Unable to point to even *one* concrete illustration *in the record* of a species that would be listed by the FWS based exclusively on the interpretation of "significant" in the Final Policy, the government asserts, relying on a development post-dating publication of

_____

[14] The government asserts that none of the listing rules for those species, "mention, let alone rely on, the SPR phrase" to list the species. Br. 17 n. 11. This is incorrect. For example, the grizzly bear was listed in 1975 as a threatened species based on its status in the "48 conterminous States" – and with no discussion whatsoever of the species' far more abundant status in Canada and Alaska – based on the Act's definition of a "'threatened species' as one which is likely to become an endangered species within the foreseeable future throughout all *or a significant portion of its range*,'" and in light of the FWS's finding that the "problems . . . facing the grizzly bears *of the 48 conterminous States could render this species endangered within the foreseeable future throughout its range*" in the "Lower 48" states. 40 Fed. Reg. 31,735 (July 28, 1975) (emphasis added). In addition, regardless of whether the listings explicitly "mention" the "SPR phrase," the indisputable fact is that the *analysis* employed by the Service focused on the importance of conserving the contiguous U.S. portions of the species' ranges irrespective of what their loss would mean to members of the same species elsewhere. *Id*.; *see also* 43 Fed. Reg. 6,230 (Feb. 14, 1978) (listing bald eagles that "nest in the lower 48 States" based on threats in that portion of the species' range and without any consideration of whether the loss of eagles in the contiguous U.S. would threaten the entire species). As commenters on the Final Policy correctly stressed, that such iconic species might never have gained ESA protection had the approach in the Final Policy been applied to determine their status speaks volumes about how far the Service has traveled from Congress's intent in passing the statute.

the 2014 Policy by two years, that "*NMFS* [the National Marine Fisheries Service] recently found that listing a species was warranted based on threats to a significant portion of a species' range." Br. 11 (citing 81 Fed. Reg. 17,398 (Mar. 29, 2016)). This contention misses the mark for a number of reasons.

**First**, as this Court has previously recognized, review of agency action under the APA is ordinarily confined to the administrative record was before the agency *at that time the decision at issue was made*, i.e., the "materials that the agency relied on in its final decision, as well as all materials that might have influenced the agency's decision." ECF No. 46 at 2. Accordingly, a court's consideration of "post hoc" developments as support for the agency's decision is "disfavored." *Gifford Pinchot*, 378 F.3d at 1072 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 419 (1971)). And it would be especially incongruous for the Court to sustain the Final Policy based on extra-record information where, as here, the FWS has withheld on "deliberative process" and other grounds many hundreds of documents that *were* before the FWS when it adopted the Final Policy. *See* ECF No. 46.

**Second**, in any event, the post hoc development relied on by defendants proves nothing. As the government concedes, NMFS in fact has *not* listed the foreign species to which it refers (the African coelacanth) based on a finding that it is endangered or threatened in a significant portion of its range. Br. 12 n. 9. Instead, NMFS has listed only the Tanzanian population as threatened based on a determination that it *qualifies as a DPS under the DPS Policy*. *See* 81 Fed. Reg. at 17,398. Consequently, the fact remains that defendants have not pointed to a single species, either in the administrative process leading to adoption of the Final Policy or even subsequently, that has in fact been listed, or that has even been proposed for listing, based *solely* on the species' ability to satisfy the "significant portion of its range" definition set forth in the Final Policy. On the record here, therefore, the Court must conclude that the SPR definition set forth in the Policy suffers from essentially the same violation of basic principles of statutory interpretation that the Court of Appeals invoked in *Defenders*.

1

2    **Third**, in a portion of the coelacanth decision that can best be described as dictum

3    – since it had no practical bearing on NMFS's decision to list the Tanzanian population

4    as a DPS pursuant to the DPS Policy – NMFS stated that the population would *also*

5    qualify as an SPR.  81 Fed. Reg. at 11,375.  Although the Supreme Court has instructed

6    that such statements should generally be disregarded, *see NAHB I*, 551 U.S. at 659

7    (refusing to afford any weight to a Federal Register statement that was "dictum" and "had

8    no bearing on the final agency action" before the Court), if NMFS's dictum is considered

9    it merely reinforces Plaintiffs' challenges to the Final Policy.

10    NMFS found that the Tanzanian portion of the species' range is *presently* at "risk

11    of extinction" based on a variety of "ongoing or future threats" including overfishing and

12    habitat destruction, and that the "species' natural biological vulnerability to

13    overexploitation exacerbates the severity of these threats and *places the population at an*

14    *increased risk of extinction within the foreseeable future*."  81 Fed. Reg. at 17,401

15    (emphasis added); *see also id.* ("[W]e find that the Tanzanian population is at a *moderate*

16    *risk of extinction within the foreseeable future*.").  In addition, NMFS found that the

17    Tanzanian population is "one of only three confirmed populations of the African

18    coelacanth, all considered to be small and isolated," and that the "loss of any one of the

19    three known African coelacanth populations would *significantly increase the extinction*

20    *risk of the species as a whole, as only two small populations remain, making them more*

21    *vulnerable to catastrophic events such as storms, disease, or temperature anomalies*."

22    *Id.* at 17,401 (emphasis added).

23    Plainly, if, as NMFS found, (1) the Tanzanian portion of the species' range is

24    *presently* at "risk of extinction within the foreseeable future" and (2) the "foreseeable"

25    loss of this portion "significantly increase[s] the extinction risk of the species as a

26    whole," then it logically, if not unavoidably, follows that the "species as a whole" is at

27    risk of extinction.  Consequently, far from demonstrating that the SPR interpretation in

28    the Final Rule gives independent meaning to the phrase, the dictum in NMFS's

coelacanth decision only serves to confirm that the interpretation impermissibly conflates the SPR and "all" bases for listing species as endangered or threatened.[15]

**Fourth**, even if defendants had been able to point to a single instance in which the definition of "significance" in the Final Policy might have real-world consequences – which they were not – that would hardly render the definition "reasonable" or "permissible" for purposes of *Chevron* analysis. The principle of statutory construction applied by the Court of Appeals in *Defenders* – i.e., that an agency's interpretation must give meaningful "'effect to *all* of [the statute's] provisions,'" 258 F.3d at 1142 (quoting *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 549 (1996)) – does not evaporate so long as an agency can muster some isolated illustration of the interpretation's possible application. Nor, as the government suggests, does the principle cease to apply so long as one can "*imagine . . . scenarios*" in which the interpretation might conceivably be applied, Br. 12 (emphasis added).[16]

As articulated by the Supreme Court and the Ninth Circuit, the "cardinal principle

---

[15] The dictum in the coelacanth finding also illustrates yet another fallacy in defendants' arguments. According to the government, a "portion [of a species' range] can be imperiled" – such as the coelacanth – "yet still contribute to the viability of the species," whereas "[i]f one assumes that portion is no longer there, then the rest of the range does not benefit from those contributions and it would necessarily *be easier to conclude* that the rest of the range is threatened or maybe even endangered." Br. 16 (emphasis added). It is true, of course, that the instantaneous disappearance of a vital portion of a species' range would place the entire species at more *imminent* risk of extinction than a less abrupt albeit foreseeable loss, but that hardly means that the anticipated loss of the "imperiled" population does not endanger or threaten the species as a whole. In fact, the Ninth Circuit in *Defenders* rejected an identical argument, reasoning that it not only equates the "all" and "SPR" bases for listing, but also fails to take into account the statutory function served by the "threatened" designation. *See Defenders*, 258 F.3d at 1142 (rejecting the government's argument that the approach to the SPR issue in that case "offer[ed] protection to species not yet faced with imminent extinction and therefore reflect[ed] the incremental approach Congress intended in the ESA to provide," because "this function too is fulfilled elsewhere in the statute," i.e., the "threatened" designation); *id.* (explaining that the FWS's "interpretation thus conflates the distinct ESA protections for species facing extinction throughout 'all' and throughout a 'significant portion' of their range with the separate protections for 'threatened' and for 'endangered species'").

[16] In this case, even that imaginative exercise must bear little fruit, as evidenced by the fact that the hypothetical "example" provided during the FWS's adoption of the Final Policy was illustrative of a species that plainly *would* be considered endangered or threatened in *all* of its range under the Ninth Circuit's analysis. *See* Plf. Br. 33 n. 16.

of statutory construction" applied in *Defenders* is that statutes must be construed so "no clause, sentence, or word shall be *superfluous, void, **or insignificant***." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (emphasis added; internal quotation omitted); *see also Commodity Futures Trading Comm'n v. White Pine Trust Corp.*, 574 F.3d 1219, 1225 (9th Cir. 2009) (applying the "'cardinal principle'" of statutory interpretation that statutes are to be interpreted so that "'no clause, sentence, or word shall be superfluous, void, or insignificant'") (quoting *TRW*, 534 U.S. at 31).   Consequently, the Supreme Court and Ninth Circuit have repeatedly rejected as impossible to harmonize with Congress's intent agency interpretations that render statutory terms "*insignificant**, if not wholly superfluous*," and that would have no practical import "in all but the most unlikely situations."  *TRW*, 534 U.S. at 31 (rejecting the government's interpretation of statutory language where the "independent function one could attribute" to the provision as interpreted "would arise only in 'rare and egregious case[s]," and where a "proviso accounting for more than half of th[e] text [in the statutory provision at issue] would lie dormant in all but the most unlikely situations"); *see also Roberts v. Sea-Land Services, Inc.*, 132 S. Ct. 1350, 1358 (2012) (rejecting an interpretation of a provision of the Longshore and Harbor Workers' Compensation Act that would make the provision largely irrelevant in the statutory scheme, explaining that "[w]e will not construe [the provision] in a manner that renders it 'entirely superfluous in all but the most unusual circumstances'") (quoting *TRW, Inc.*, 534 U.S. at 29); *Weinberger v. Salfi*, 422 U.S. 749, 758 & n. 6 (1975) (rejecting an interpretation that "relegated [a provision] to a function which is already performed by other statutory provisions" and explaining that the "possibility that the . . . interpretation renders the [provision] only largely superfluous rather than totally so is not sufficient"); *Collins v. Gee West Seattle LLC*, 631 F.3d 1001, 1008 & n. 7 (9th Cir. 2011) (rejecting a  construction of a statutory provision that would "eviscerate much of the relevance and purpose behind" the provision and would render it "largely superfluous"); *Commodity Futures Trading Comm'n*, 574 F.3d at 1225 & n.5 (9th Cir. 2009) (rejecting proffered interpretation that created redundancy and noting that

"if the best that one can say for [a] proposed interpretation is that it is possible in theory but absurd in practice, *then we must decline the proposal*") (emphasis added).

Indeed, the fact that even defendants struggle in their briefs to explain coherently how the approach in the Final Policy diverges from what the Ninth Circuit found impermissible confirms the absence of any functional difference.  For example, according to the government, the Ninth Circuit rejected a definition under which the "portion of the range must be so important that <u>current imperilment</u> there would mean that the species would be currently imperiled everywhere" whereas the approach in the Final Policy considers what would happen if the species "were hypothetically to be <u>completely extirpated</u>" from that portion of its range.  Br. 15.

But this purported distinction is meaningless *as a practical matter* because, under the Final Policy, a species cannot be listed based on its status in a portion of its range unless the species is *in fact* – and not merely "hypothetically" – *currently endangered or threatened in that portion of its range*.  *See* 79 Fed. Reg. at 37,587 ("If we have identified any portion that may be both (1) significant and (2) endangered or threatened, we will engage in a more detailed analysis *to determine whether these standards are indeed met*.") (emphasis added).  Because a listing ultimately *cannot* occur under the Final Policy unless a portion of a species is *in fact presently endangered or threatened with extirpation*, and the anticipated loss of that presently imperiled population will render the entire species "in danger of extinction or likely to become so in the foreseeable future throughout all of its range," then the Final Policy has the practical effect of equating the SPR determination with the "all" basis for listing, notwithstanding the "hypothetical" inquiry the Policy calls for at the front end of the analysis and the fact that the analysis takes place in "two steps" instead of one.  Br. 15.  This is *why* the FWS, in adopting the Final Policy, could not pinpoint any real-world species that would in fact be listed based solely on the definition of "significant" in the Policy.

In any event, the fact that the government is reduced to arguing that one can "imagine" farfetched scenarios in which the interpretation of "significant" in the Final

Policy would have independent meaning (although defendants have not even succeeded in doing that), Br. 12, and arguing that Plaintiffs must "establish that it is *impossible*" for such scenarios to come to pass, *id.* (emphasis added), amounts to a concession that the interpretation renders the SPR phrase in the statutory definitions of both endangered and threatened species at the very least "*insignificant*, if not wholly superfluous."  *TRW Inc.*, 534 U.S. at 31 (emphasis added).  That is more than enough, along with the other fatal flaws in the Final Policy – such as the admitted failure to afford any weight whatsoever to the overriding statutory purpose of avoiding the loss of species in the United States – to necessitate a ruling by this Court that the FWS's interpretation is demonstrably *not* a reasonable or "permissible" one to which the Court may defer under *any* interpretive standard.  *Brand X*, 545 U.S. at 982-83, 986 (citing *Chevron*, 467 U.S. at 843-45).

### C.   THE FINAL POLICY DID NOT ACKNOWLEDGE, LET ALONE EXPLAIN, ITS REJECTION OF THE APPROACH TO "SIGNIFICANCE" SET FORTH IN THE M-OPINION AND <u>APPLIED BY THE FWS IN LISTING DECISIONS.</u>

Defendants also have no persuasive response to Plaintiffs' argument that the Final Policy must be set aside because the FWS failed to coherently explain why (or even acknowledge that) the approach to assessing "significance" set forth in the M-Opinion was being abandoned in favor of an interpretation that will have little if any practical utility in furthering the purposes of the ESA.  *See* Pl. Br. 35.  The government asserts that the M-Opinion "was never subjected to notice and comment" and, as a result, the FWS was under no obligation to address why it was adopting an inconsistent approach to the significance inquiry in the Final Policy.  Br. 7 n. 7.  However, because the premise of this syllogism is wrong, so too is its conclusion.

In reality, the far more flexible approach to "significance" in the M-Opinion *was* invoked in notice and comment proceedings on *multiple* occasions.  For example, in a final rule adopted following notice and comment proceedings determining that the Wyoming part of the wolf's range in Wyoming, Idaho, and Montana constituted an SPR, the Service *expressly* applied the approach to significance in the M-Opinion, explaining

that "[s]pecifically, *we may not define 'significant' to require that a species is endangered only if the threats faced by a species in a portion of its range are so severe as to threaten the viability of the species as a whole*."  74 Fed. Reg. 15,123, 15,153 (April 2, 2009) (emphasis added).  Further, the FWS relied on the Opinion to *reject* a comment arguing that a "portion of the range of a species can be significant *only if its loss would put the future of the species in doubt*," *id*. (emphasis added) – an approach that parallels the interpretation in the Final Policy.  *See also id*. ("The Solicitor's Opinion includes a comprehensive evaluation of this issue and the relevant case law.").

Instead, relying on the M-Opinion, the FWS applied a far less demanding approach "similar to that we have used in other recent listing determinations," *id*. – and that the FWS's pygmy-owl biologists employed in initially determining that the Sonoran Desert Ecoregion constituted an SPR, *see* Plf. Br. 6-9 – under which a "portion of a species' range is significant if it is part of the current range of the species and it contributes substantially to the representation, resiliency, or redundancy of the species" and its "loss would result in a decrease in the ability to conserve the species."  74 Fed. Reg. at 15,153; *see also* 74 Fed. Reg. 56,757, 56,766 (Nov. 3, 2009) (finding a portion of the Queen Charlotte goshawk's range to be significant, and explaining that "[f]or purposes of this finding, a[n] [SPR] is an area that is important to the conservation of the species because it contributes meaningfully to the representation, resiliency, or redundancy of the species" and its "loss would result in a decrease in the ability to conserve the species," but "[i]t *does not mean that if such portion were lost, the species as a whole would be in danger of extinction immediately or in the foreseeable future*; rather, that the ability to conserve the species would be compromised") (emphasis added); 73 Fed. Reg. 77,264, 77,276 (Dec. 18, 2008) (finding for southern rockhopper penguin) ("For purposes of this finding, a significant portion of a species' range is an area that is important to the conservation of the species because it contributes meaningfully to the representation, resiliency, or redundancy of the species").  Therefore, the FWS certainly *did* apply the M-Opinion's approach to determining significance in notice and

comment proceedings.

Nor is there any validity to defendants' contradictory claims that the Final Policy did not "reflect a change" in interpretation from that set forth in the M-Opinion, Br. 20, *and* that the "FWS in fact did acknowledge those differences." *Id.  Both* of those assertions cannot be correct and, on inspection, neither is.

As for whether the Final Policy reflected a "change" in interpretation, not only did FWS rulemakings applying the M-Opinion explicitly *reject* an approach under which a portion of a species' range must be so important that its loss would result in the whole species being "in danger of extinction immediately or in the foreseeable future," 74 Fed. Reg. at 56,766; *see also* 62 Fed. Reg. 15,123, 15,153, but the M-Opinion also stressed that such an approach "*would severely diminish the [FWS's] ability to achieve one of the primary objectives of the ESA,* which is to '[safeguard] for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.'" SPR-431 (emphasis added; internal quotation omitted).

The Final Policy, therefore, most assuredly did represent a fundamental shift in the FWS's interpretation of "significant" in the SPR phrase.  In addition, the government's assertion that the "FWS in fact did acknowledge those differences" is disingenuous because the language that the government quotes to support that proposition is taken entirely out of context.  Br. 20 (quoting SPR-6).  In context, the quoted language stating that the "conclusion reached in this draft policy is, as noted above, inconsistent with the M-Opinion," *id*., is *not referring to the definition of "significant" at issue here* but, rather, to that part of the M-Opinion that concluded that species that are listed based on their status in an SPR should be protected by the ESA only in *that* portion – which, as all parties agree, has nothing to do with plaintiffs' claims in this case.[17]  With respect to the

_____

[17] The government concedes that while this aspect of the M-Opinion was rejected by "2010 court decisions," the M-Opinion's approach to defining significance was never called into question by any court.  Br. 6 & n. 6; *see also* Int. Br. 22-23 (referring to the "two district court opinions" that held that species could not be protected in only parts of their ranges).

part of the M-Opinion that *is* at issue in this case, not only did the FWS fail to clearly "display awareness that it *is* changing position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), but the agency incorrectly asserted that the "status determinations" it would make under its new approach "will be the same" as the "period during which FWS implemented the M-Opinion," 79 Fed. Reg. at 37,609 – an assertion that is impossible to harmonize with what the FWS actually said and did while the M-Opinion was in effect.

Finally, the government argues that whether the M-Opinion "set forth a reasonable interpretation is irrelevant" because the only legal question is whether the Final Policy is a "reasonable interpretation." Br. 6 n.6. For the reasons previously described, totally apart from the unexplained inconsistency with the M-Opinion, the interpretation in the Final Policy cannot be deemed reasonable. But the fact that the FWS deviated from its prior interpretation without even acknowledging the magnitude of the change affords *additional* grounds for invalidating the SPR definition in the Final Policy. Not only is it the case that an "agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is *entitled to considerably less deference than a consistently held view*," *Nat. Res. Def. Council v. EPA*, 526 F.3d 591, 602 (9th Cir. 2008) (emphasis added), but, once again, it is a fundamental precept of APA review that an agency must at least "display awareness that it *is* changing position," in addition to articulating a legally satisfactory rationale for the change. *Fox Television*, 556 U.S. at 515. Because the FWS did not do so in the Final Policy, and even Federal Defendants' brief is internally contradictory on the issue, this affords yet another reason for why the Final Policy must be vacated and remanded.

## **CONCLUSION**

For these reasons, as well as those set forth in Plaintiffs' opening brief, Plaintiffs are entitled to summary judgment and both the pygmy-owl finding and Final Policy should be vacated and remanded for further proceedings.

1

2                             Respectfully submitted,

3                             */s/ Eric R. Glitzenstein*

Eric R. Glitzenstein

4                             D.C. Bar No. 358287 (admitted *pro hac vice*)

MEYER GLITZENSTEIN & EUBANKS LLP

5                             4115 Wisconsin Avenue, N.W., Suite 210

Washington, DC 20016

6                             (202) 588-5206 / (202) 588-5049 (fax)

eglitzenstein@meyerglitz.com

7

                             /s/ William S. Eubanks II

8                             William S. Eubanks II

D.C. Bar No. 987036 (admitted *pro hac vice*)

9                             MEYER GLITZENSTEIN & EUBANKS LLP

3206 Norwood Court

10                           Fort Collins, CO  80525

(970) 703-6060 / (202) 588-5049 (fax)

11                           beubanks@meyerglitz.com

12                           Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Eric R. Glitzenstein (D.C. Bar No. 358287) (admitted *pro hac vice*)
   MEYER GLITZENSTEIN & EUBANKS LLP
2  4115 Wisconsin Avenue, N.W., Suite 210
   Washington, DC 20016
3  Telephone: (202) 588-5206
   Facsimile: (202) 588-5049
4  eglitzenstein@meyerglitz.com

5  William S. Eubanks II (D.C. Bar No. 987036 (admitted *pro hac vice*_
   MEYER GLITZENSTEIN & EUBANKS LLP
6  3206 Norwood Court
   Fort Collins, CO 80525
7  Telephone: (970) 703-6060
   Facsimile: (202) 588-5049
8  beubanks@meyerglitz.com

9  Attorneys for Plaintiffs

10

11              **IN THE UNITED STATES DISRICT COURT**
                  **FOR THE DISTRICT OF ARIZONA**

12 _____
                                            )
13 CENTER FOR BIOLOGICAL DIVERSITY,         )
   DEFENDERS OF WILDLIFE,                   )
14                                          )
                 Plaintiffs,                )  No. 4:14-cv-02506-RM
15                                          )
         v.                                 )
16                                          )  **PLAINTIFFS' RESPONSE**
                                            )  **TO FEDERAL DEFENDANTS'**
17 Sally JEWELL, Secretary, U.S. Department of the ) **AND INTERVENORS'**
   Interior, Daniel M. ASHE, Director, U.S. Fish & ) **STATEMENTS OF**
18 Wildlife Service,                        )  **MATERIALS FACTS**
                                            )
19                 Defendants.              )
                                            )
20 _____)

21       As set forth in Plaintiffs' Statement of Material Facts and in the Federal Defendants'

22 Statement of Material Facts (which is joined in pertinent part by Intervenors) in a case such

23 as this one, which is reviewed pursuant to the judicial review provisions of the

24 Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the Court does not sit as a trier of

25 fact to resolve disputed issues of fact but, rather, determines as a matter of law whether the

26 agency decision, in light of the administrative record, is "arbitrary, capricious, an abuse of

27 discretion or otherwise not in accordance with law."  *Id*; *see* ECF No. 58 at 1 (citing

28 *Occidental Eng'g Co. v. INS*, 733 F.2d 766, 769 (9th Cir. 1985).  With that understanding

of the law, Plaintiffs respond to Federal Defendants' and Interenors' Statements of Material Facts as follows:

### RESPONSE TO FEDERAL DEFENDANTS' STATEMENT

1.      These are statements of law and characterizations of the Endangered Species Act ("ESA") rather than statements of fact.

2.      The first three sentences are characterizations of law rather than statements of fact.  The last sentence is a legal argument rather than a statement of fact.

3.      The first three sentences are characterizations of law and, specifically, excerpts from the FWS's "DPS Policy," which speaks for itself and is the best evidence of its contents.  The last sentence is a legal argument rather than a statement of fact.  To the extent that the sentence implies that the "significance criteria" in the DPS Policy include the importance of a species to the United States, it is erroneous and therefore disputed.

4.      These statements selectively cite from and characterize the Solicitor of the Interior Department's 2007 Opinion ("M-Opinion") and the Ninth Circuit's ruling in *Defenders of Wildlife*, 258 F.3d 1136 (9th Cir.2001) ("*Defenders*"), which speak for themselves and are the best evidence of their contents.

5.      Plaintiffs admit that the M-Opinion was issued in 2007 "analyzing the SPR language."  The second two sentences, which purport to characterize the general purpose of "Solicitor M-Opinions," are unsupported by any citation to the record and also consist of legal assertions rather than facts.  To the extent that the statements in this paragraph are intended to imply that the M-Opinion at issue in this case never went through notice and comment proceedings, this is erroneous and therefore disputed, because the approach to "significant" in the M-Opinion was adopted in multiple notice and comment proceedings by the Fish and Wildlife Service ("FWS").  *See, e.g.*, 74 Fed. Reg. 15,123, 15,153 (April 2, 2009); 74 Fed. Reg. 56,757, 56,766 (Nov. 3, 2009); 73 Fed. Reg. 77,264, 77,276 (Dec. 18, 2008); *see also* Intervenors' Statement of Facts at ¶ 40 (conceding that listing determinations in 2008 and 2009 were "governed" by the M-Opinion).

6.      The first three sentences selectively and misleadingly characterize the M-Opinion which speaks for itself and is the best evidence of its contents.  The M-Opinion specifically rejected an approach to defining "significant" that is functionally identical to the Final Policy adopted by FWS.  *See* SPR-431 (explaining that "to read the SPR phrase instead as requiring that a species be in danger of extinction throughout its entire range before it could be considered 'endangered' for purposes of the ESA would severely diminish the Secretary's ability to achieve one of the primary objectives of the ESA, which is to '[safeguard], for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants'") (internal quotation omitted).  The M-Opinion therefore leaves no doubt that the assessment of "significance" in an SPR determination should take into consideration the value of avoiding the loss of species in the United States even if they are more plentiful elsewhere.  *See* SPR-431,437.  With respect to the last two sentences, while it is undisputed that the FWS drafted general guidance based on the M-Opinion that was never finalized, it is erroneous and therefore disputed that the "M-Opinion was never adopted as policy by FWS" because the FWS, in fact, adopted and relied on the M-Opinion in multiple species-specific rulemakings, and specifically did so in defining "significant" in a manner that is much broader than the interpretation in the Final Policy.  *See, e.g.*, 74 Fed. Reg. 15,123, 15,153 (April 2, 2009); 74 Fed. Reg. 56,757, 56,766 (Nov. 3, 2009); 73 Fed. Reg. 77,264, 77,276 (Dec. 18, 2008).  Plaintiffs also point out that Defendants' statement that the M-Opinion was "never adopted as policy by FWS" is contradicted by Defendants' own statement and citations in Paragraph 7 of their Statement of Facts, which make clear that the FWS did rely on the definition of "significant" in the M-Opinion in multiple species-specific rulemakings.  *See also* Intervenors' Statement of Facts at ¶ 40 (conceding that listing determinations in 2008 and 2009 were "governed" by the M-Opinion).

7.      Plaintiffs do not dispute that the FWS relied on the M-Opinion to conclude that the species referred to were endangered or threatened in a significant portion of their ranges.

8.      Plaintiffs do not dispute that litigation was brought challenging an aspect of the M-Opinion that is not at issue in this case.  The rulings in those cases speak for themselves and are the best evidence of their contents.

9.      Plaintiffs admit that the FWS withdrew the M-Opinion and replaced it with the Final Policy.  The assertion that the Final Policy is "consistent with" the Ninth Circuit's analysis is a legal argument that Plaintiffs dispute.

10.     Plaintiffs do not dispute the first sentence.  The second and third sentences do not assert any facts.

11.     These statements purport to selectively characterize portions of the administrative record which speak for themselves and are the best evidence of their contents.

12.     Plaintiffs do not dispute the first sentence.  The second two sentences selectively characterize a March 10, 1997 Federal Register Notice which speaks for itself and is the best evidence of its contents.

13.     This paragraph selectively characterizes judicial rulings that speak for themselves and are the best evidence of their contents.

14.     The first sentence characterizes an April 14, 2006 Federal Register Notice that speaks for itself and is the best evidence of its contents. The second sentence is erroneous and therefore disputed.  Plaintiffs Defenders of Wildlife did challenge the FWS's decision to remove the Arizona DPS listing, but their challenge was rejected, primarily on the grounds that the removal was consistent with the Ninth Circuit's analysis of the limitations of the FWS's DPS Policy.  *See* ECF No. 242 in *Nat'l Ass'n of Home Builders v. Kempthorne*, No. V-00-903 (D. Ariz. Mar. 12, 2007).

15.     Plaintiffs do not dispute that they submitted a new petition to list the pygmy-owl on March 17, 2007.  The rest of the paragraph purports to selectively characterize the petition, which speaks for itself and is the best evidence of its contents.

16.     Plaintiffs do not dispute the first sentence.  The rest of the paragraph consists of characterizations of law or selective characterizations of the FWS's positive 90-day

finding that speaks for itself and is best evidence of its contents.

17.    Plaintiffs do not dispute the first paragraph.  The remainder of the paragraph purports to selectively characterize a document in the administrative record – a draft 12-month finding that the pygmy-owl is threatened in the Sonoran Desert Ecoregion portion of its range and should be listed on that basis – that speaks for itself and is the best evidence of its contents.

18.    The statements purport to selectively characterize a document in the administrative record – a draft 12-month finding that the pygmy-owl is threatened in the Sonoran Desert Ecoregion portion of its range and should be listed on that basis – that speaks for itself and is the best evidence of its contents.

19.    Plaintiffs dispute the first sentence because the administrative record, including the document cited by the government, reflects that the FWS revisited the 2009 draft finding not because of any new science calling the draft finding into question but rather because the FWS was then in the process of considering a new, more restrictive definition of "significant" in the SPR phrase.  *See* PO-765 (4/26/11 internal memorandum stating that "we need to use the latest draft SPR policy" in deciding on the pygmy-owl's listing status); PO-767 (statement by FWS biologist that in the "current version of the of the [pygmy-owl finding], we show that the Sonoran Desert Ecoregion meets the criteria for significance based on redundancy, resilience, and representation.  I still believe that to be the case.  However, under the current draft of the SPR policy, that is not sufficient.  We must now look at the remainder of the range, outside of the Sonoran Desert Ecoregion, and determine whether, should the Sonoran Desert Ecoregion portion of the [range] become hypothetically extirpated, the remaining portion be in danger of extinction?").  The second sentence purports to characterize court rulings that speak for themselves and are the best evidence of their contents.  The third and fourth sentences purport to selectively characterize the FWS's new interpretation of the SPR language and the FWS's motivation in crafting the interpretation based on administrative record documents that speak for themselves and are the best evidence of their contents.

20.     Plaintiffs do not dispute that the FWS applied a Draft SPR Policy that had never been subjected to public notice and comment in coming to a new conclusion, at variance with the 2009 draft finding, that the Sonoran Desert Ecoregion does not qualify as an SPR.   The remainder of the paragraph purports to selectively quote from and characterize administrative record documents that speak for themselves and are the best evidence of their contents.

21.     Plaintiffs do not dispute that the FWS staff concluded that the western and eastern portions of the pygmy-owl's range meet the significance and discreteness criteria of the DPS policy.   The remainder of the paragraph purports to selectively characterize administrative record documents that speak for themselves and are the best evidence of their contents.

22.     Plaintiffs do not dispute the first sentence.   Nor do Plaintiffs dispute that their challenge in this case is limited to challenging the FWS's determination that the Sonoran Desert Ecoregion does not qualify as an SPR for listing purposes.   The remainder of the paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

23.     Plaintiffs do not dispute the first sentence.   The remainder of the paragraph purports to selectively quote from and characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

24.     Plaintiffs do not dispute that the FWS applied an SPOR test under which the Service considered whether a hypothetical loss of the Sonoran Desert Ecoregion would result in the rest of the species being in danger of extinction.   Nor do Plaintiffs dispute that pygmy-owls in the Sonoran Desert Ecoregion have been reduced to an extremely imperiled status due to habitat loss and degradation and myriad other factors.   The remainder of the paragraph purports to selectively quote from and characterize documents in the administrative record that speak for themselves and are the best evidence of their contents.

25.     This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

26.     This paragraph purports to quote and selectively characterize the final pygmy-owl finding which speaks for itself and is the best evidence of its contents.

27.     Plaintiffs do not dispute the first sentence and also do not dispute that the SPR definition in the Draft Policy was substantially the same as the one invoked in the pygmy-owl finding.

28.  This paragraph purports to selectively quote from and characterize the Draft Policy, which speaks for itself and is the best evidence of its contents.

29.     Plaintiffs do not dispute that FWS received approximately 41,900 comments, the overwhelming majority of which opposed the proposed policy on the grounds that it would insufficiently protect endangered and threatened species, especially in the U.S. portions of their ranges.  The rest of the paragraph purports to characterize the comments, which speak for themselves and are the best evidence of their contents.

30.     Plaintiffs do not dispute that the FWS published the Final SPR Policy on July 1, 2014.  The rest of the paragraph purports to selectively characterize the Final Policy's summary of public comments, which speaks for itself and is the best evidence of its contents.

31.     This paragraph purports to selectively quote from and characterize the Final SPR Policy, which speaks for itself and is the best evidence of its contents.

32.     This post-record development is not in the administrative record and hence should not be considered by the Court.  In any event, NMFS did not in fact list the species at issue based on any SPR finding but, rather, listed a population of the species as a DPS pursuant to the DPS Policy, which is not at issue here.  *See* 81 Fed. Reg. 17,398 (Mar. 29, 2016).

## RESPONSE TO INTERVENORS' STATEMENT

1.     These statements are not material to any issue in this case.

2.     Plaintiffs do not dispute these statements.

3.     These statements purport to selectively characterize materials in the

administrative record that speak for themselves and are the best evidence of their contents.

4.      These statements purport to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

5.      These statements purport to selectively characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

6.      These statements purport to selectively characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

7.      These statements purport to selectively characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

8.      These statements purport to selectively characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

9.      The first three sentences in this paragraph purport to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.  The last sentence sets forth intervenors' own conclusion unaccompanied by any citation.  In addition, to the extent that the sentence is intended to convey that pygmy-owls in the Sonoran Desert Ecoregion do not occupy a "special or unique" portion of the species' range, this is contradicted by the final pygmy-owl finding.  *See, e.g.*, 76 Fed. Reg. at 61,882 (explaining that the "Sonoran Desert Ecoregion is already characterized by hot, arid conditions, and pygmy-owls in this portion of the range are already adapted to the hotter, more arid conditions that may prevail in the future.").

10.     These statements purport to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.  In addition, to the extent that these statements are intended to convey that pygmy-owls in Arizona have not suffered a severe population decline as a result of human habitat destruction and degradation, this is contradicted by the final pygmy-owl finding.  *See, e.g.*, 76 Fed. Reg. at 61,862 ("In Arizona and Texas, apparent range and population declines have occurred, reducing the current distribution of the pygmy-owl in these areas."); *id*. at 61,863 ("This provides strong evidence that the current range of the pygmy-owl in Arizona has

contracted."); *id*. ("the historical distribution of the pygmy-owl in Arizona, when compared to the current distribution, has unquestionably been reduced"); *id*. at 61,864 ("In conclusion, pygmy owl distribution in the United States has contracted, with pygmy-owls no longer found in Maricopa, Cochise, Yuma, and Santa Cruz Counties in Arizona . . . ."). Further, the statements in this paragraph are not material to any issue in this case because the Intervenors' view of the pygmy-owl's secure status in Arizona was not a basis on which the FWS decided against listing the species.  To the contrary, the FWS concluded that the pygmy-owl is in fact imperiled in Arizona as well as in the remainder of the Sonoran Desert Ecoregion.  *See* 76 Fed. Reg. at 61,878 ("[W]e have detailed information that in the Arizona and Sonoran Desert Ecoregion, pygmy-owl habitat loss and fragmentation resulting from urbanization, changing fire regimes due to the invasion of bufflegrass, agricultural development and woodcutting, overgrazing, and borders issues have had significant negative impacts on pygmy-owl habitat and will likely continue to do so to varying degrees in the foreseeable future."); *id*. at 61,884 (explaining that there are "severe impacts" to pygmy-owls in Arizona and northern Mexico).

11.     This paragraph quotes a document from the record that speaks for itself and is the best evidence of its contents.

12.     This paragraph purports to selectively quote from and characterize the FWS's initial listing decision for the pygmy-owl, which speaks for itself and is the best evidence of its contents.

13.     This paragraph purports to selectively characterize documents in the record and the published critical habitat designation for the pygmy-owl, which speak for themselves and are the best evidence of their contents. Plaintiffs do specifically dispute that there are a "significant number" of pygmy-owls in Arizona because that is contradicted by the final pygmy-owl finding as well as other findings by the FWS in the record.  *See, e.g.*, 76 Fed. Reg. at 61,863 ("Recent surveys indicate that probably fewer than 50 adult pygmy-owls exist in the state, with 10 or fewer nest sites on an annual basis"); *id*. at 61,846 ("Survey results for Arizona indicate that approximately 50 adult pygmy-owl remain.  In

addition, there are few large expanses of Arizona with suitable pygmy-owl habitat that have not been completely surveyed or for which pygmy-owl information is not available for evaluation."). In addition, the statements in this paragraph are not material to any issue in this case because the FWS, in refusing to list the pygmy-owl, did not rely on Intervenors' view that there are significant numbers of pygmy-owls in Arizona. *Id*.

14. This paragraph purports to selectively characterize documents in the record, which speak for themselves and are the best evidence of their contents. Plaintiffs do specifically dispute that the pygmy-owl in Arizona is being adequately protected in the absence of ESA listing because that is specifically contradicted by the final pygmy-owl finding as well as other FWS findings in the record. *See, e.g.*, 76 Fed. Reg. at 61,879 (explaining that existing protections in Arizona "have not been effective in protecting the pygmy-owl in Arizona from further decline"); *id*. at 61,880 ("There are currently no statutory or regulatory provisions under Arizona law addressing the destruction or alteration of pygmy-owl habitat."); *id*. at 61,880 ("Laws and regulations within the range of the of the pygmy-owl in both the United States and Mexico do not address the loss of or impacts to pygmy-owl habitat."). In addition, the statements in this paragraph are not material to any issue in this case because the FWS, in refusing to list the pygmy-owl, did not rely on Intervenors' view that protections for the pygmy-owl in Arizona are adequate in the absence of ESA listing.

15. This paragraph purports to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

16. This paragraph purports to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

17. This paragraph purports to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

18. This paragraph purports to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents. The last sentence contains intervenors' speculation unsupported by any citation to the record.

10

19.     This paragraph purports to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

20.     This paragraph sets forth intervenors' legal arguments and characterizations regarding the DPS Policy.

21.     Plaintiffs do not dispute that the FWS listed the pygmy-owl in 1997.  The remainder of the paragraph purports to selectively quote and characterize the listing decision, which speaks for itself and is the best evidence of its contents.

22.     This paragraph purports to selectively quote and characterize the 1997 pygmy-owl listing decision, which speaks for itself and is the best evidence of its contents.

23.     Plaintiffs do not dispute that intervenors challenged the 1997 listing rule or that Plaintiffs intervened in that litigation.  The rest of the paragraph simply sets forth intervenors' characterization of their legal position in that litigation.

24.     This paragraph purports to selectively quote from and characterize the court's September 2001 summary judgment disposition, which speaks for itself and is the best evidence of its contents.

25.     This paragraph purports to selectively quote from and characterize the Ninth Circuit's August 2003 ruling in Intervenors' challenge to the 1997 listing decision.  The Ninth Circuit's ruling speaks for itself and is the best evidence of its contents.

26.     Plaintiffs do not dispute that on remand the FWS decided that the Arizona population of pygmy-owls is not a DPS and on that basis removed the pygmy-owl from the endangered species list.  The remainder of the paragraph purports to selectively quote from and characterize the FWS's April 2006 delisting determination, which speaks for itself and is the best evidence of its contents.

27.     Plaintiffs do not dispute that Defenders of Wildlife challenged the 2006 delisting decision on various grounds, which primarily related to whether the delisting decision comported with the FWS's DPS Policy.

28.     Plaintiffs do not dispute the statements in this paragraph.

29.     This paragraph purports to selectively quote and characterize Defenders of

Wildlife's brief in prior litigation, which speaks for itself and is the best evidence of its contents.

30.     Plaintiffs do not dispute the statement in this paragraph.

31.     Plaintiffs do not dispute the statement in this paragraph.

32.     Plaintiffs do not dispute the statements in this paragraph.

33.     This paragraph purports to selectively quote and characterize a joint policy of the FWS and NMFS, which speaks for itself and is the best evidence of its contents.

34.     Plaintiffs do not dispute that these agency employees, among others, worked on the pygmy-owl issue.  Plaintiffs dispute that there is "no evidence in the record that any of the FWS employees was a 'pygmy-owl expert.'"  For example, the draft finding to list the pygmy-owl was prepared by Scott Richardson, a Fish and Wildlife Biologist with the Arizona Ecological Services office in Tucson, who has had extensive experience dealing with pygmy-owl issues both in his work with the FWS and in his prior professional work. *See, e.g.*, PO-578; *see also* Intervenors' Proposed Finding ¶ 38 (acknowledging that "staff biologist" Scott Richardson worked on the pygmy-owl finding).

35.     The statements in this paragraph purport to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents. In addition, these statements are not material to any issue in this case because Plaintiffs are not challenging any of the FWS's taxonomic determinations.

36.     The statements in this paragraph purport to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents. In addition, these statements are not material to any issue in this case because Plaintiffs are not challenging any of the FWS's taxonomic determinations.

37.     The statements in this paragraph purport to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents. In addition, these statements are not material to any issue in this case because Plaintiffs are not challenging any of the FWS's taxonomic determinations.

38.     Plaintiffs do not dispute the first or second sentences.  The third sentence

purports to selectively quote from and characterize a document in the record that speaks for itself and is the best evidence of its contents.

39.     The statements purport to characterize materials in the administrative record that speak for themselves and are the best evidence of their contents.

40.     Plaintiffs do not dispute the first sentence.  The rest of the paragraph purports to selectively quote from and characterize the M-Opinion, which speaks for itself and is the best evidence of its contents.

41.     Plaintiffs do not dispute the first sentence.  The rest of the paragraph contains Intervenors' characterization of the draft document prepared by Mr. Richardson, which speaks for itself and is the best evidence of its contents, as well as Intervenors' speculation that Mr. Richardson relied on an unidentified "guidance document."   Plaintiffs do specifically dispute any suggestion that Mr. Richardson only considered the "current range of the pygmy-owl within the Sonoran Desert Ecoregion or biotic community," because the draft finding compared the Sonoran Desert Ecoregion to other portions of the pygmy-owl's range and concluded that, e.g., the "ecological setting of this portion of the range differs from the remainder of the range" and that pygmy-owls in the "Sonoran Desert Ecoregion are adapted to hotter, drier conditions than pygmy-owls elsewhere in the range."

42.     This paragraph purports to selectively quote and characterize materials in the record that speak for themselves and are the best evidence of their contents.

43.      This paragraph purports to selectively quote and characterize materials in the record that speak for themselves and are the best evidence of their contents.

44.     This paragraph purports to selectively quote and characterize materials in the record that speak for themselves and are the best evidence of their contents.

45.     Plaintiffs do not dispute the statement in this paragraph.

46.     Plaintiffs do not dispute the statements in this paragraph.

47.     This paragraph purports to selectively quote and characterize materials in the record that speak for themselves and are the best evidence of their contents.

48.     Plaintiffs do not dispute the first sentence.  The remainder of the paragraph

13

purports to characterize rulings in two lawsuits, which speak for themselves and are the best evidence of their contents.

49.     Plaintiffs do not dispute the first sentence.  The remainder of the paragraph purports to characterize a lawsuit filed by Intervenors that speaks for itself and is the best evidence of its contents.

50.     Plaintiffs do not dispute the first and third sentences although Plaintiffs dispute any implication that Intervenors' lawsuit had any bearing on the withdrawal of the M-Opinion.   The second sentence purports to characterize the Interior Solicitor's withdrawal of the M-Opinion, which speaks for itself and is the best evidence of its contents.

51.     This paragraph purports to selectively quote and characterize materials in the record that speak for themselves and are the best evidence of their contents.

52.      This paragraph purports to selectively quote and characterize materials in the record that speak for themselves and are the best evidence of their contents.

53.     This paragraph purports to selectively quote and characterize materials in the record that speak for themselves and are the best evidence of their contents.

54.     This paragraph purports to selectively characterize materials in the record that speak for themselves and are the best evidence of their contents.

55.     This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

56.     This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

57.     This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

58.     This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

59.     This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

60.    This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

61.    This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

62.    This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

63.    This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

64.    This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

65.    This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

66.    This paragraph purports to selectively characterize the final pygmy-owl finding, which speaks for itself and is the best evidence of its contents.

Respectfully submitted,

*/s/ Eric R. Glitzenstein*
Eric R. Glitzenstein
D.C. Bar No. 358287 (admitted *pro hac vice*)

MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Avenue, N.W., Suite 210
Washington, DC 20016
Telephone: (202) 588-5206
Facsimile: (202) 588-5049
eglitzenstein@meyerglitz.com

William S. Eubanks II
D.C. Bar No. 987036 (admitted *pro hac vice*)

MEYER GLITZENSTEIN & EUBANKS LLP
3206 Norwood Court
Fort Collins, CO  80525
Telephone: (970) 703-6060

1

2

Facsimile: (202) 588-5049
beubanks@meyerglitz.com

3

4

Attorneys for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing document is being served on all counsel of record, this 14th day of December, 2016, by filing on the Court's electronic filing system.

<u>/s/Eric R. Glitzenstein</u>
Eric R. Glitzenstein