# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al., | No. CV-14-02506-TUC-RM |
| Plaintiffs, | **ORDER** |
| v. | |
| Sally Jewell, et al., | |
| Defendants. | |

Pending before the Court are Cross-Motions for Summary Judgment filed by Plaintiffs Center for Biological Diversity and Defenders of Wildlife ("Plaintiffs")[1] (Doc. 52); Defendants Sally Jewell, Secretary of the United States Department of the Interior ("the Secretary"), and Daniel M. Ashe, Director of the United States Fish and Wildlife Service (collectively, "Federal Defendants") (Doc. 56); and Intervenor-Defendant Southern Arizona Home Builders Association ("Home Builders") (Doc. 62).[2]

Plaintiffs challenge two interrelated agency actions on the grounds that they violate the Endangered Species Act ("ESA"), 16 U.S.C. § 1532, *et seq.* and are arbitrary and capricious in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. §

---

[1] Plaintiffs are conservation membership organizations with recreational, aesthetic, scientific, and organizational interests adversely affected by the agency actions under review. (*See* Doc. 52-1, 52-2, 52-3, 52-4.) Defendants do not challenge Plaintiffs' standing.

[2] No party requested oral argument and, given the thoroughness of the parties' briefs and the nature of the issues, the Court finds that oral argument is unnecessary.

1  706(2). Specifically, Plaintiffs challenge the Federal Defendants' refusal to list the cactus
2  ferruginous pygmy owl ("pygmy owl") as a threatened or endangered species under the
3  ESA and the Service's interpretation of the phrase "significant portion of its range" in the
4  ESA's definitions of endangered and threatened species.

**I.  Statutory Framework**

The ESA was enacted, in relevant part, to provide for the conservation of endangered and threatened species, as well as the ecosystems upon which such species depend. *See* 16 U.S.C. § 1531(b). The term "species" is defined by the ESA as including "any subspecies of fish or wildlife or plants, and any distinct population segment" ("DPS")[3] "of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). A species is considered "endangered" under the ESA if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is considered "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

Any interested person may petition the Secretary to list a species as endangered or threatened. 5 U.S.C. § 553(e); 16 U.S.C. § 1533(b)(3)(A). Upon receipt of such a petition, the Secretary must determine "whether the petition presents substantial scientific or commercial information indicating the petitioned action may be warranted," and, if it does, "promptly commence a review of the status of the species concerned." 16 U.S.C. § 1533(b)(3)(A). This initial determination is known as a 90-day finding. The agency's final determination on whether the petitioned action is warranted is known as a 12-month finding. *See id.* § 1533(b)(3)(B). Negative findings are "subject to judicial review." *Id.* § 1533(b)(3)(C)(ii); *see also id.* § 1540(g).

In determining whether a species is endangered or threatened for purposes of the

---

[3] Pursuant to agency policy, determining whether a given population qualifies as a "distinct population segment" requires analysis of the "[d]iscreteness of the population segment in relation to the remainder of the species to which it belongs" and the "significance of the population segment to the species to which it belongs." *See Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996).

ESA, the Secretary must consider: "(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1). Listing determinations must be made "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

The ESA requires the Secretary to "establish, and publish in the Federal Register, agency guidelines" regarding "criteria for making" listing determinations. *Id.* § 1533(h). The Secretary must provide the public with notice of any proposed guidelines and an opportunity to submit written comments. *Id.*

## II. Standard of Review

Agency decisions under the ESA are governed by the APA. *Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). Under the APA, an agency action must be set aside "if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). Under this "highly deferential" standard of review, the Court's role is limited to determining whether "a reasonable basis exists" for the agency's decision. *Indep. Acceptance Co. v. Cal.*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted). The Court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). So long as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the agency's action must be affirmed. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983). Particular deference is afforded to agency discretion that "is exercised in an area where the agency has special 'technical expertise,'" such as "[a]ssessing a species' likelihood of extinction." *Trout Unlimited v. Lohn*, 559 F.3d 946, 955, 959 (9th Cir. 2009) (quoting

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989)).

However, agency action must be set aside if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or rendered a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. When such deficiencies exist, the Court may not attempt to make up for them by supplying "a reasoned basis for the agency's action that the agency itself has not given." *Id.* (internal quotation marks omitted); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (courts may not "speculate on reasons that might have supported an agency's decision"); *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1525 (9th Cir. 1995) (courts may not "attempt to make up for deficiencies in the agency's decision").

Judicial review of agency action is generally limited to evidence contained in the administrative record. *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988). The Court's role is not to act as a fact finder but, rather, to determine, as a matter of law, whether the agency's decision is supported by the administrative record. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Because cases involving review of final agency action under the APA do not generally involve disputed facts, summary judgment is typically the proper mechanism for resolving them. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *see also* Fed. R. Civ. P. 56(a) (summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

Under the APA, the Court decides "all relevant questions of law" and interprets statutory provisions. 5 U.S.C. § 706. "If the intent of Congress is clear," the Court must give effect to that "unambiguously expressed intent." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). If the statute is ambiguous, the Court must determine how much deference to give to an administrative interpretation of

the statute. *Nw. Ecosystem Alliance*, 475 F.3d at 1141. If Congress has explicitly or implicitly delegated authority to the agency "to elucidate a specific provision of the statute by regulation," such "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44. In other words, an agency's statutory interpretation qualifies for *Chevron* deference if Congress has "delegated authority to the agency generally to make rules carrying the force of law," and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). When *Chevron* deference is applicable, an agency's construction of am ambiguous statute must be given controlling effect so long as it is reasonable. *Christensen v. Harris Cnty.*, 529 U.S. 576, 586-87 (2000). An agency's statutory construction may be found unreasonable if it "ignores the plain language of the statute," renders statutory language "superfluous," or "frustrate[s] the policy Congress sought to implement" in the statute. *Pac. Nw. Generating Coop v. Dep't of Energy*, 580 F.3d 792, 806, 812 (9th Cir. 2009).

Agency interpretations that are beyond the pale of the *Chevron* doctrine, though not controlling, nevertheless "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The measure of deference afforded to such interpretations varies depending upon the thoroughness of the agency's consideration, the validity of the agency's reasoning, "consistency with earlier and later pronouncements, and all those factors" which give the agency's construction "power to persuade, if lacking power to control." *Id.*; *see also Mead*, 533 U.S. at 228.

**III. Discussion**

    **A. Background**

Plaintiffs' challenge centers on the proper interpretation of the statutory phrase "significant portion of its range." 16 U.S.C. § 1532(6), (20). The ESA does not define this phrase, and the Ninth Circuit has recognized it as "puzzling" and "inherently

- 5 -

1 ambiguous." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001).

2 A prior administrative construction viewed the SPR language as rendering a species eligible for protection under the ESA only if the species faced threats in a portion of its range that were "so severe as to threaten the viability of the species throughout" all of its range. (SPR AR 428.)[4] This construction was sometimes referred to as the "clarification interpretation" because it viewed the SPR phrase as merely a clarification of how the Service may determine a species to be endangered throughout all of its range. (*Id.*) In *Defenders of Wildlife*, the Ninth Circuit rejected the clarification interpretation, finding that it conflated the terms "all" and "significant portion," and thereby impermissibly rendered the ESA's SPR language superfluous. 258 F.3d at 1141-42.

In March 2007, partly in response to the *Defenders of Wildlife* decision, the Solicitor of the Department of the Interior issued a Memorandum Opinion analyzing the SPR language ("M-Opinion"). (SPR AR 427-462.) The M-Opinion concluded—consistent with the *Defenders of Wildlife* analysis—that the Secretary has broad discretion in defining what portion of a range is "significant," so long as the Secretary's definition gives substantive effect to the statutory SPR language. (SPR AR 429, 435-36.) The M-Opinion indicated that, in determining whether a portion of a species' range is "significant," the Secretary may consider the size of the portion in relation to the current range as a whole, as well as the biological importance of the portion to the species and in terms of the values listed in the ESA. (SPR AR 437.) The United States Fish and Wildlife Service ("the Service") later issued a Draft Guidance (SPR AR 521-55) that interpreted the SPR phrase, in light of the M-Opinion and Congressional intent, as meaning that a portion of a range is significant if it "contributes meaningfully to the conservation" of a listable entity based on its contribution to the resiliency, redundancy, and representation of the entity (SPR AR 523).

---

[4] Citations to the administrative record of the agency's SPR policy are designated "SPR AR" followed by the Bates number at which the cited material appears. Citations to the administrative record of the agency's pygmy owl finding are designated "Pygmy AR" followed by the relevant Bates number.

- 6 -

In the same month that the Solicitor issued the M-Opinion, March 2007, Plaintiffs filed a petition to list the pygmy owl as a threatened or endangered species under the ESA. (Pygmy AR 89-145.)[5] The Service[6] commenced a status review of the species after issuing a 90-day finding that the petition presented "substantial scientific or commercial information indicating that listing the pygmy-owl throughout all or a portion of its range may be warranted." *90-Day Finding on a Petition to List the Cactus Ferruginous Pygmy-Owl (Glaucidum ridgwayi cactorum) as Threatened or Endangered with Critical Habitat*, 73 Fed. Reg. 31,418, 31,424 (June 2, 2008) (reproduced at Pygmy AR 78-84).

In July 2009, the Service circulated a draft 12-month finding which concluded that listing of the pygmy owl within a significant portion of its range, namely the Sonoran Desert Ecoregion,[7] was warranted under the ESA but precluded by higher priority listing ("Draft Pygmy Owl Finding"). (Pygmy AR 579-661.) In reaching this draft finding, the Service interpreted the SPR phrase to mean that a portion of a species' range is significant if it "is important to the conservation of the species because it contributes

---

[5] The Service had previously published a final rule listing an Arizona distinct population segment ("DPS") of the pygmy owl as endangered. *See Determination of Endangered Status for the Cactus Ferruginous Pygmy-Owl in Arizona*, 62 Fed. Reg. 10,730 (March 10, 1997). However, after Intervenor Home Builders filed a lawsuit challenging the listing, the Ninth Circuit found the Service had not articulated a rational basis for its conclusion that the Arizona population was significant to its taxon so as to qualify it as a DPS. *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 840, 852 (9th Cir. 2003). The Service then published a final rule removing the pygmy owl from the list of endangered species based on a determination that the Arizona pygmy-owl population did not qualify as a DPS. *See Final Rule to Remove the Arizona Distinct Population Segmetn of the Cactus Ferruginous Pygmy-owl (Glaucidium brasilianum cactorum) from the Federal List of Endangered and Threatened Wildlife*, 71 Fed. Reg. 19,452 (Apr. 14, 2006). Defenders of Wildlife unsuccessfully challenged the removal. *See Nat'l Ass'n of Home Builders v. Norton*, No. 07-15854, 2009 WL 226048 (9th Cir. Jan. 30, 2009) (mem.), *aff'g* No. CV-00-903-SRB (D. Ariz. March 12, 2007).

[6] The ESA is administered jointly by the Service and the National Marine Fisheries Service. *See* 50 C.F.R. § 402.01(b). The pygmy owl falls under the jurisdiction of the Service. *See id.*

[7] Pursuant to then-existing agency policy which, as explained below, was later withdrawn after being rejected by two courts, a species deemed to be endangered or threatened in a significant portion of its range was afforded protection only within that portion rather than the entirety of its range.

- 7 -

meaningfully to the representation, resiliency, or redundancy of the species," such that its loss "would result in a decrease in the ability to conserve the species." (*Id.* at 635.) Applying this interpretation, the Service concluded that the pygmy-owl population in the Sonoran Desert Ecoregion was "important for long-term survival" of the pygmy-owl species as a whole "due to its substantial contributions to the resiliency, redundancy, and representation" of the species. (*Id.* at 647.) The Service further found that the loss of the Sonoran Desert Ecoregion portion of the pygmy-owl range—which would cause the loss of "significant ecological, morphological, and genetic diversity"—would move the pygmy-owl species "toward extinction" and "decrease the ability to conserve" the species. (*Id.*) The Service concluded, based on "the best scientific and commercial information available," that the Sonoran Desert Ecoregion was "a significant portion of the pygmy-owl's range within which the pygmy-owl is declining, and is affected by ongoing threats," with the threats and population declines continuing into the foreseeable future. (*Id.* at 648.)

The Department of the Interior withdrew the M-Opinion in May 2011 after two court opinions rejected the M-Opinion's conclusion that a species imperiled in a significant portion, but not all, of its range should be listed only in that portion. (SPR AR 79,503); *See Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010); *WildEarth Guardians v. Salazar*, CV-09-00574-PHX-FJM, 2010 WL 3895682 (D. Ariz. Sept. 30, 2010).

After the withdrawal of the M-Opinion, the Service developed an interpretation of the SPR language which deemed a portion of a species' range to be "significant" only "if its contribution to the viability of the species is so important that, without that portion, the species would be in danger of extinction." *See Draft Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species"* ("Draft SPR Policy"), 76 Fed. Reg. 76,987, 76,990-91 (Dec. 9, 2011) (reproduced at SPR AR 1-20.). The Service published notice of the Draft SPR Policy on December 9, 2011 and solicited comments from the

public. In so doing, the Service explained that it intended "to publish a final policy" that would "provide a uniform standard for interpretation of the SPR language and its role in listing determinations," but that the Draft SPR Policy could not "become final" until after the completion of notice-and-comment procedures. 76 Fed. Reg. at 77,002. The Service specified that, during the interim, it would consider the Draft SPR Policy "as nonbinding guidance in making individual listing determinations . . . only as the circumstances warrant." *Id.*[8]

On October 5, 2011, shortly before the publication of the Draft SPR Policy, the Service published a 12-month finding on Plaintiffs' petition to list the pygmy owl. *See 12-Month Finding on a Petition to List the Cactus Ferruginous Pygmy-Owl as Threatened or Endangered with Critical Habitat* ("Final Pygmy Owl Finding"), 76 Fed. Reg. 61,856 (Oct. 5, 2011) (reproduced at Pygmy AR 2232-71.) Unlike the Draft Pygmy Owl Finding, the Final Pygmy Owl Finding concluded that listing the pygmy owl as endangered or threatened under the ESA was not warranted. 76 Fed. Reg. at 61,893. The Service found that the western and eastern population segments of the pygmy owl were "discrete" and "significant" so as to qualify as DPSs, but that the pygmy owl did "not meet the definition of a threatened or endangered species throughout its range" or within either DPS. *Id.* at 61,885, 61,888-89. The Service then went on to consider whether the Sonoran Desert Ecoregion was a significant portion of the pygmy owl's range or the Western DPS's range. *Id.* at 61,891-93. In making this determination, the Service applied the SPR definition later set forth in the Draft SPR Policy instead of the more fluid approach that had been outlined in the withdrawn M-Opinion and applied in the Draft Pygmy Owl Finding. *See id.* at 61,890. The Service found that the pygmy owl "may be threatened or endangered" in the Sonoran Desert Ecoregion, based on its analysis of the

---

[8] Furthermore, the Service opined "that the outcomes of [its] status determinations with or without the draft policy would be the same" under most circumstances. *Id.* at 77,003. This assertion is somewhat puzzling in light of the fact that, by the time the Draft SPR Policy was published, the Service's application of the SPR definition of that policy had already—as explained below—caused the Service to reverse course on its pygmy-owl status determination.

- 9 -

factors delineated in 16 U.S.C. § 1533(a)(1). 76 Fed. Reg. at 61,891. The Service acknowledged that "the Sonoran Desert Ecoregion represents an important portion of the Western DPS, and of the taxon as a whole." *Id.* at 61,893. The Service also found that the theoretical loss of the Sonoran Desert Ecoregion would cause a loss of a third of the Western DPS's range, representing "a significant loss of important habitat and genetic diversity" which "might reduce the viability and potential for long-term survival of the remaining portion of the DPS." *Id.* at 61,892-93. The Service opined that, without the Sonoran Desert Ecoregion, the remainder of the Western DPS "may lack sufficient resiliency to meet future environmental changes that are already manifesting themselves within this DPS." *Id.* at 61,893. However, the Service concluded that the Sonoran Desert Ecoregion was not "significant" because the best available information did not indicate that the pygmy owl or the Western DPS would likely become extinct if the Sonoran Desert Ecoregion were theoretically extirpated. *Id.* at 61,892-93.

On July 1, 2014, after conclusion of notice-and-comment procedures, the Service issued a final policy interpreting the SPR language of the ESA. *See Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species"* ("Final SPR Policy"), 79 Fed. Reg. 37,578 (July 1, 2014) (reproduced at SPR AR 74-109). Under the Final SPR Policy, a portion of a species' range is considered "'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." 79 Fed. Reg. at 37,579. This definition purports to set a lower threshold for significance than the definition contained in the Draft SPR Policy. *Id.* The Service explained that the lower threshold was requested by many commenters and was found to be appropriate because it would "further the conservation purposes" of the ESA and "more clearly avoid the appearance of similarity" to the clarification interpretation rejected by the Ninth Circuit. *Id.*

- 10 -

### B. Plaintiffs' Challenge to the Final SPR Policy

Because the SPR language in the ESA is "inherently ambiguous," *Defenders of Wildlife*, 258 F.3d at 1141, the Court is unable to simply give effect to the "unambiguously expressed intent" of Congress, *Chevron*, 467 U.S. at 842-43. Instead, the Court must determine the degree of deference owed to the Service's interpretation of the SPR language. *See Nw. Ecosystem Alliance*, 475 F.3d at 1141.[9] The parties do not dispute that the *Chevron* framework is applicable with respect to the Final SPR Policy. The Final SPR Policy was enacted after the notice-and-comment rulemaking procedures required by 16 U.S.C. § 1533(h). Congress has "expressly delegated authority to the Service to develop criteria for evaluating petitions to list endangered species" under the ESA, and the formality required by 16 U.S.C. § 1533(h) "is indistinguishable from notice-and-comment rulemaking under the APA," which weighs "in favor of affording *Chevron* deference." *Nw. Ecosystem Alliance*, 475 F.3d at 1141.

Because *Chevron* deference is applicable to the Final SPR Policy, the SPR interpretation set forth in that policy must be given controlling effect so long as it is a reasonable construction of the ESA. *See Chevron*, 467 U.S. at 843-44; *Christensen*, 529 U.S. at 587. The Ninth Circuit has already held that an administrative construction of the ESA's SPR language "is unacceptable" if it renders the SPR language superfluous. *Defenders of Wildlife*, 258 F.3d at 1142. The SPR language cannot permissibly be interpreted "to mean that a species is eligible for protection under the ESA" only "if it faces threats in enough key portions of its range that the *entire species* is in danger of extinction, or will be within the foreseeable future." *Id.* (emphasis in original, internal quotation marks omitted).

---

[9] Federal Defendants argue that Plaintiffs' challenge to the Final SPR Policy is a facial challenge, and that Plaintiffs therefore bear the burden of showing that "no set of circumstances exists" under which the policy would be valid. (Doc. 57 at 10-11 (citing *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016); *Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008).) The Court is not convinced that the "no set of circumstances" test is applicable here, but even if it is, Plaintiffs have shown—as discussed below—that there are no circumstances under which accurate application of the Final SPR Policy would result in a finding that a species is endangered or threatened in a significant portion but not all of its range.

- 11 -

Defendants do not dispute that the ESA's SPR language must be interpreted in a manner that provides an independent basis for listing. (*See, e.g.*, Doc. 57 at 12 n.10.) Indeed, the Final SPR Policy itself recognizes that the SPR phrase cannot be interpreted such that a portion of a species' range is considered significant only if the current status of the species throughout its range is endangered or threatened as a result of the endangered or threatened status of the species in that portion. 79 Fed. Reg. at 37,581-82. As explained in the Final SPR Policy, such an interpretation renders the SPR phrase redundant by limiting it "to situations in which it is unnecessary." *Id.* The Final SPR Policy purports to avoid this problem and "leave[] room for listing a species that is not currently imperiled throughout all of its range." *Id.* at 37,582. It does so by specifying that a portion of a species' range can be "significant" only "if the species is not currently endangered or threatened throughout all of its range," and by requiring examination of the effects of the hypothetical extirpation of the species in the portion at issue. *Id.* These attempts to distinguish the Final SPR Policy from the "clarification interpretation" rejected by the Ninth Circuit in *Defenders of Wildlife* are illusory.

Under the Final SPR Policy, listing a species based on threats in a significant portion of its range will be considered warranted only if three conditions are satisfied: (1) the species is neither endangered nor threatened throughout all of its range, (2) the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be endangered or threatened throughout all of its range, and (3) the species is endangered or threatened in that portion of its range. *See* 79 Fed. Reg. at 37,582-83. All three of these conditions cannot be satisfied at once, because whenever conditions (2) and (3) are satisfied, a species should properly be determined to be endangered or threatened throughout all of its range. If a portion of a species' range is so vital that its loss would render the entire species endangered or threatened, and the species is endangered or threatened in that portion, then the entire species is necessarily endangered or threatened. Threats that render a species endangered or threatened in such a vital portion of its range should necessarily be imputed to the

- 12 -

species overall.[10] The Final SPR Policy's requirement that a portion of a species' range can be considered significant only "if the species is not currently endangered or threatened throughout all of its range," 79 Fed. Reg. at 37,582—far from ensuring that the "significant" and "all" language of the ESA will retain independent meaning—actually ensures that a portion of a species' range will never be considered significant based on accurate application of the Final SPR Policy.

Defendants argue that application of the Final SPR Policy has resulted in a finding that a portion of a species' range is significant, pointing to the Service's final rule on a petition to list the African coelacanth. *See Final Rule to List the Tanzanian DPS of African Coelacanth (Latimeria chalumnae) as Threatened Under the Endangered Species Act*, 81 Fed. Reg. 17,398 (March 29, 2016). However, rather than showing that accurate application of the Final SPR Policy can result in a finding that a portion of a species' range is significant, the Service's final listing determination regarding the African coelacanth merely indicates that the Service has had difficulty accurately applying the Final SPR Policy. There are three confirmed populations of the African coelacanth, each of which is small and isolated. 81 Fed. Reg. at 17,401. The Service found that, due to the populations' isolation, "the loss of one would not directly impact the other remaining populations," but that it would nevertheless "significantly increase the extinction risk of the species as a whole" by rendering the remaining two populations "more vulnerable to catastrophic events such as storms, disease, or temperature anomalies." *Id.* The Service thus concluded that a threatened population—the Tanzanian population—constituted a significant portion of the range of the species.[11] *Id.* Notably, however, the Service did not find that the African coelacanth would be in danger of extinction currently or in the

---

[10] Defendants argue that an imperiled population in a portion of a species' range may still contribute to the viability of the species. While it is true that a species' extinction risk would likely increase if members in a vital portion of the species' range were completely extirpated rather than merely imperiled, the imperilment of the members in that vital portion still constitutes imperilment to the species overall.

[11] Because the Tanzanian population also constituted a valid DPS, the Service listed the DPS rather than the entire species. *Id.*

- 13 -

1  foreseeable future if the Tanzanian population were extirpated; instead, it found that
2  extirpation of the Tanzanian population would "*significantly increase the extinction risk*"
3  of the African coelacanth overall. *Id.* (emphasis added).  This is a different standard than
4  the one articulated in the Final SPR Policy.  Whereas the Final SPR Policy provides that
5  a portion of a species' range should be considered "significant" only if its "contribution
6  to the viability of the species overall is so important that, without the members in that
7  portion, the species" overall would be endangered or threatened, 79 Fed. Reg. at 37,579,
8  the standard applied by the Service in its listing determination regarding the African
9  coelacanth deems a portion of a species' range "significant" if its contribution to the
10 viability of the species overall is so important that, without the members in that portion,
11 the species overall would be at a *significantly increased risk of extinction*, 81 Fed. Reg. at
12 17,401.  The definition of "significant" applied by the Service in the final rule on the
13 petition to list the African coelacanth may very well be a reasonable interpretation of the
14 ESA's statutory language, but it is not the definition set forth in the Final SPR Policy.

15 The Court recognizes that the Service has broad discretion to interpret the SPR
16 language of the ESA.  *See Defenders of Wildlife*, 258 F.3d at 1145.  In light of this broad
17 discretion, the majority of Plaintiffs' arguments against the Service's SPR interpretation
18 are unavailing.  The SPR interpretation set forth in the Final SPR Policy does not violate
19 the plain language of the ESA merely because it fails to define "significant" as
20 synonymous with "important."  *See id.* at 1141 (recognizing that the ESA "use[s]
21 language in a manner in some tension with ordinary usage").  The Final SPR Policy is not
22 unreasonable merely because it fails to require special consideration of the potential loss
23 of a species' population within the United States, as the ESA does not explicitly require
24 the Secretary, in making listing determinations, to provide special or heightened
25 consideration to species imperiled in the United States but abundant elsewhere.  The
26 Final SPR Policy is not unreasonable merely because it differs from the M-Opinion and
27 the Service's prior Draft Guidance, neither of which were final, binding agency rules
28 achieved through notice-and-comment rulemaking procedures; agencies are free to

change their minds if they follow proper procedures in doing so, *see Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658-59 (2007), and the Service adequately explained the reasons for its change in approach. Finally, the Final SPR Policy is not unreasonable merely because it sets a high threshold for significance in order to "avoid dilution of conservation efforts and unnecessary restrictions." 79 Fed. Reg. at 37,581. If Plaintiffs' challenge were merely to the wisdom of the threshold chosen by the Service, the challenge would fail. *See Chevron*, 467 U.S. at 866.

However, it appears that the Service's goal in creating the Final SPR Policy was to give as little substantive effect as possible to the SPR language of the ESA in order to avoid providing range-wide protection to a species based on threats in a portion of the species' range. This goal is arguably at odds with the conservation purposes of the ESA and, in pursuing this goal, the Service chose a definition of significance that renders the SPR phrase superfluous by limiting it to situations in which it is unnecessary. "Whatever the outer limits of the range of permissible constructions" of the ESA, the Court is "certain that what lies beyond them" is an interpretation that renders key statutory language meaningless and redundant in order to achieve a goal at odds with the purposes of the statute. *Natural Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 881 (9th Cir. 2005). The SPR interpretation set forth in the Final SPR Policy impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA. *Cf. Pac. Nw. Generating Coop*, 580 F.3d at 812. Accordingly, it is not a permissible administrative construction of the ESA's SPR language. The Final SPR Policy is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A).

### C. Plaintiffs' Challenge to Final Pygmy Owl Finding

The Service did not apply the SPR interpretation contained in the Final SPR Policy to the listing determination contained in the Final Pygmy Owl Finding; instead, the Service applied the SPR interpretation contained in the Draft SPR Policy, which provided that a portion of a species' range should be considered "significant" only "if its

1  contribution to the viability of the species is so important that, without that portion, the
2  species would be in danger of extinction." 76 Fed. Reg. at 76,990-91.

3     The parties dispute whether the Draft SPR Policy is entitled to *Chevron* deference.
4  The Draft SPR Policy is not an agency rule carrying the force of law; indeed, in
5  publishing notice of the policy, the Service specified that the policy was not final and
6  would be treated by the agency only as "nonbinding guidance" during the notice-and-
7  comment period. 76 Fed. Reg. at 77,002. To the extent that the Draft SPR Policy differs
8  from the Final SPR Policy, it is beyond the pale of the *Chevron* doctrine and is entitled
9  only to *Skidmore* deference based on its "power to persuade." *Skidmore*, 323 U.S. at 140.
10 However, in the end, it matters little whether the deferential framework applicable to the
11 Draft SPR Policy stems from *Chevron* or *Skidmore*, because the SPR interpretation set
12 forth in that policy suffers from the same fundamental defect as the SPR interpretation set
13 forth in the Final SPR Policy. If a portion of a species' range is "significant" only "if its
14 contribution to the viability of the species is so important that, without that portion, the
15 species would be in danger of extinction," 76 Fed. Reg. at 76,990-91, and the species is
16 endangered or threatened in that portion (as would be required for listing), then the
17 species is necessarily endangered or threatened overall. The Draft SPR Policy, like the
18 Final SPR Policy, impermissibly renders the SPR language of the ESA superfluous by
19 limiting it to situations in which it is unnecessary.

20    Because the agency applied an impermissible construction of the ESA's SPR
21 language in finding that the Sonoran Desert Ecoregion is not a significant portion of the
22 pygmy owl's or Western DPS's range, the Service's Final Pygmy Owl Finding is
23 "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in
24 violation of the APA. 5 U.S.C. § 706(2)(A).
25 . . . .
26 . . . .
27 . . . .
28 . . . .

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 52) is **granted**, and Defendants' Cross-Motions for Summary Judgment (Docs. 56, 62) are **denied**. For the reasons set forth in this Order, the "12-Month Finding on a Petition to List the Cactus Ferruginous Pygmy-Owl as Threatened or Endangered with Critical Habitat," 76 Fed. Reg. 61,856 (Oct. 5, 2011), and the "Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's Definitions of 'Endangered Species' and 'Threatened Species,'" 79 Fed. Reg. 37,578 (July 1, 2014), are vacated and remanded. The Clerk of Court is directed to enter judgment accordingly and close this case.

Dated this 28th day of March, 2017.

Honorable Rosemary Márquez
United States District Judge